### LYNCH DAVIDSON & CO. v. DENMAN LUMBER CO.   (No. 3005.)

(Court of Civil Appeals of Texas. Texarkana. Feb. 19, 1925. Rehearing Denied Feb. 26, 1925.)

1. **Sales &#9901;291—After title has passed to buyer, unpaid seller may stop goods in transitu only if buyer insolvent.**

Where bill of lading contained no reservation of right to stop delivery in transit, and goods had been sold on credit for delivery at shipping point, so that property had passed to buyer, unpaid seller had equitable right to stop goods in transitu only if buyer was insolvent.

2. **Contracts &#9901;253—Consent to rescission of simple contract may be implied from acts and conduct.**

The consent of parties to rescission of simple contract may be implied from acts and conduct, and need not be shown by express agreement.

3. **Sales &#9901;92—Seller's act in stopping delivery by carrier to which buyer consented held to constitute a rescission by mutual consent.**

Where seller of lumber, without legal justification, stopped delivery by carrier, after it had been sold and delivered to buyer by delivery to carrier, and buyer expressly consented thereto, *held* that rescission of contract was thereby effected by mutual consent, and subsequent offer to deliver did not prevent rescission, in absence of consent of buyer.

4. **Contracts &#9901;252—Simple contract may be abrogated by naked agreement to that effect.**

A simple contract may be abrogated by a naked agreement to that effect.

Appeal from District Court, Titus County; R. T. Wilkinson, Judge.

Action by Lynch Davidson & Co. against the Denman Lumber Company. From an insufficient judgment in its favor, plaintiff appeals. Affirmed.

The appellant brought the suit against the appellee for the price of a carload of lumber alleged to have been sold and delivered in October, 1920, under a contract of sale. The petition alleged that in September, 1920, the appellant agreed to sell to appellee three cars of lumber of certain sizes, lengths, and description, and at a fixed price; that the contract provided that appellant was to pay the freight, and delivery of the lumber to the railway company at point of shipment should constitute delivery to the appellee, and that appellant was not to be responsible for the safe delivery of the lumber; that one car of lumber was shipped to and accepted by appellee; that there was a mutual cancellation of the order for the second car of lumber; that the third car was loaded by appellant at New Willard, Tex., on September 27, 1920, in Missouri Pacific car No. 16637, and a bill of lading was issued by the railway company, naming the appellee as consignee; that the appellee has failed and refuses to pay the contract price of the lumber, which was $1,388.70, less freight charges of $113.58.

The appellee admitted the making of the contract, but pleaded that after the carload of lumber in suit had been loaded in the car, and while it was in transit and before the car arrived at Mt. Pleasant, its destination, the appellant notified and had the delivering railroad company refuse delivery of the car of lumber to appellee; that when the car reached Mt. Pleasant the appellee undertook to take possession of the car and unload it, but was advised by the railway agent that delivery thereof was withheld, and delivery was refused; that immediately upon being so advised the appellee wired the appellant agreeing to the withholding of the car of lumber and the refusal of delivery, and thereby mutually agreed with appellant to cancel and abrogate the original contract; that thereafter the car remained in the railroad yards and was incurring demurrage, and the appellant and appellee then agreed, in

---

order to stop further accrual of demurrage, and without prejudice to the rights of either party, that appellee should unload the lumber and pay therefor the then market price less freight and demurrage; that the market value of the lumber at that date was $1,-025.52; the freight charge thereon was $113.-58, and the demurrage was $152.09, leaving a balance of $759.85, which amount 'was tendered to appellant before suit and is now tendered into court in payment of the amount due appellant for the lumber.

The appellant, by supplemental petition, denied, in substance, all the allegations of appellee's answer. The case was tried before the court, and judgment was entered for the appellant for the amount tendered by appellee of $759.85, with costs of suit taxed against appellant. The appellant brings the case on appeal upon the contention that it was entitled to a judgment in its favor for the original contract price of the car of lumber, of $1,388.70, less freight amounting to $113.58, together with the contract interest of 8 per cent. from 60 days after the date of the invoice.

The evidence consists mostly in letters and telegrams, and there is but little dispute about the facts. The court concluded that the legal effect attaching to the evidence was "in law a cancellation or abrogation of the contract by mutual consent of the parties." It appears that the contract price of the lumber involved in the suit was $1,275.12, exclusive of freight charges. Also the cash market value of the car of lumber at the date appellee took it over in November, 1920, was $1,025.52, and the freight and demurrage charges at that date amounted to $265.67, leaving $759.85, which was the amount tendered by appellee to appellant prior to suit and refused by appellant. It further appears, as material to state, that the contract of September 14 called for "prompt shipment" of the lumber. On September 18 appellee wrote appellant asking that the shipment be hurried, and again on September 21 appellee wrote insisting upon "quick shipment." Not having received notice of compliance with the request, the appellee, on September 28, wrote appellant not to ship the lumber, but appellant replied that the Missouri Pacific car (the one in suit) had already been loaded and shipped out. The Missouri Pacific car No. 16637 was loaded with lumber at New Willard and delivered to the Houston East & West Texas Railway Company for transportation on September 27, 1920. The bill of lading issued was an "open bill of lading" naming appellee as consignee at Mt. Pleasant. The bill of lading, together with the invoice, was mailed to appellee. The car of lumber afterwards arrived in Mt. Pleasant, its destination, on October 13, 1920, at 8:37 p. m., over the Paris & Mt. Pleasant Railway. It appears that on October 13,

1920, the appellant sent the agent of the Paris & Mt. Pleasant Railway Company at Mt. Pleasant the following telegram from Houston, which was received by the agent about noon:

"Car Mo. P. 16637 out of New Willard September 27 containing lumber shipped by us to Denman Lumber Company; do not deliver the car to consignees, but hold for our account and wire our expense whether or not has arrived."

Also, on the same date appellant instructed the initial carrier, the Houston East & West Texas Railway Company, to withhold the delivery of the car of lumber to the consignees, and the railway agent, at about 3:17 p. m. on said date, wired the agent of the Paris & Mt. Pleasant Railway Company at Mt. Pleasant as follows:

"Mt. Pleasant from New Willard 27 Mo. P. 16637 to Denman Lumber Company. Have request from shippers to withhold delivery. Arrange. Will furnish disposition later. Advise."

The agent at Mt. Pleasant received the telegram at 4:22 p. m. of the same day. On the morning of October 14, 1920, after the car had arrived at Mt. Pleasant, the appellee, according to the findings of the court—

"sent its men with wagons up to the yards of the railway company for the lumber, and they were advised by the agent of the Paris & Mt. Pleasant Railway Company that delivery of the lumber had been stopped by the plaintiff, and that he could not deliver the lumber to the consignee; and the employees informed Mr. Denman, president of the company, that the delivery of the lumber had been refused; thereupon Mr. Denman in person called at the office of the Paris & Mt. Pleasant Railway Company to ascertain why the delivery was refused, and he was advised by the said railway agent that the plaintiff had stopped delivery of the lumber, said agent further informing him of the contents of the two telegrams; that thereupon Mr. Denman told the said railway agent that the withholding orders of the plaintiff were accepted by the Denman Lumber Company, and for the railway agent to so advise the plaintiff."

At the same time, on October 14, 1920, at 10:30 a. m., the appellee wired the appellant as follows:

"Understand you instructed railroad refused delivery to us two cars of lumber. We are returning bill of lading and invoice Mo. P. today and replacing order. Erie car already unloaded."

Further, on the morning of October 14, 1920, appellee wrote appellant a letter confirming the telegram, advising the plaintiff that the withholding of the lumber "was all right, except the reflection on our credit." In the letter was enclosed the bill of lading and the invoice, and the request made, "with which credit our account and oblige." The letter was duly received by appellant. The

telegram was duly received by appellant at 12:56 p. m. of October 14, 1920. After receiving the telegram the appellant, at 1:50 p. m. of the same day, sent to the agent of the Paris & Mt. Pleasant Railway Company at Mt. Pleasant the following telegram:

"Cancel hold instructions on Denman Lumber Company and go ahead and make delivery."

This telegram was received by the agent "some time of the afternoon of the 14th." Appellant also at the same time instructed the agent of the initial carrier, the Houston East & West Texas Railway Company, to wire the agent of the railway company at Mt. Pleasant and to instruct him to "cancel the stop order given by him the day before." Thereupon the agent of the Houston East & West Texas Railway Company wired the railway agent at Mt. Pleasant as follows:

"Disregard my wire yesterday and deliver Mo. P. 16637 as billed."

The agent at Mt. Pleasant duly received the telegram that same afternoon. The appellant further, "on October 14, 1920, at 1:50 p. m.," telegraphed appellee as follows:

"Instructions relative delivery of lumber annulled after talking with you, and we shall expect you to take both cars of lumber."

The appellant, it appears, acted with reasonable dispatch in sending the telegrams in view of "the press of daily business." On October 15 appellant wrote appellee a letter, returning the bill of lading and invoice received in the letter from appellee. On October 18 the appellee replied to the letter stating:

"We are returning herewith bill of lading and invoice for the reasons given in our letter of 14th. You breached the contract in wiring transportation companies to refuse delivery to us, and until that time we would have accepted the lumber even at a loss to ourselves. However, since you do not regard the contract as very binding, and wished to save yourself a loss, you cannot consistently blame us now for not wishing to reinstate the contract and accept the lumber at a loss to ourselves."

The appellant replied to the latter on October 20, returning the bill of lading and the invoice, and insisting that:

"We did not in any manner, shape, way, or form breach the contract in wiring the transportation companies as we did, as we did not refuse a delivery of the car of lumber but requested the transportation companies to hold up the car en route, only attempting to protect ourselves as well as your company at that time."

On October 22 the appellee again returned the bill of lading and the invoice, stating in the letter:

"As explained in former correspondence, we cannot rebuy this material now."

Further letters were written "and the invoice and bill of lading were sent back and forth between the plaintiff and the defendant, the plaintiff contending that the defendant should take the lumber, and the defendant contending that the contract had been canceled and it was no longer under obligation to take the lumber." This correspondence led to the writing by appellant to appellee as follows:

"Would it not be desirable to both of us for you to unload the car? So far as we are concerned, it is agreeable to us for you to unload the car with the distinct understanding that it in no way compromises the position you are taking. It is evident that we are going to be compelled to litigate about the matter, but it is entirely unnecessary to add to the loss which will occur if it is left loaded pending the litigation."

The appellee agreed to the proposal and unloaded the car at that date. The "cash market value of the lumber at Mt. Pleasant at that date was $1,025.52, and the demurrage and freight charges amounted to $265.67." "The defendant tendered the plaintiff the sum of $759.85, the difference, and all of which was refused."

It further appears, according to the court's findings:

"That on the afternoon of October 13, 1920, the president of the plaintiff called the president of the defendant over the telephone, and stated to him that he had heard that the First National Bank of Mt. Pleasant had suspended payment, and that he desired to know if the Denman Lumber Company was in any wise involved in the bank's failure. The president of the defendant replied that it was not involved to any substantial extent. The president of defendant then said, 'If you feel panicky over the situation you can resell the material,' and the president of the plaintiff answered that he 'would do so if the Denman Lumber Company would pay the decline in the market,' and which the president of the defendant declined to do. The president of the plaintiff company then stated, 'The lumber that had been shipped would go forward to him.'"

The court further finds as a fact that—

"In this telephone conversation the president of the plaintiff company did not inform the president of the defendant company of the withholding orders, and the first the president of the defendant company knew of any such stop or withholding orders of the lumber was the information given by the agent of the railway company on the morning of October 14."

The court also finds as follows:

"I find at the time and all during October, 1920, defendant was entirely solvent; that it was not involved in the bank failure, and was good for its contracts. * * * That the president of plaintiff company in sending and having sent the telegrams to the railroad agent at Mt. Pleasant to withhold delivery of the lumber acted in entire good faith, believing, on the information furnished to him, that the defend-

ant' company was involved in the bank failure, and' with no intention of injuring or doing harm to the defendant, but merely to protect the plaintiff company in the event the bank failure had rendered the defendant insolvent."

Baker, Botts, Parker & Garwood, of Houston, for appellant.

Joe M. Burford, of Dallas, for appellee.

LEVY, J. (after stating the facts as above). The trial court decided that the legal effect attaching to the facts shown was "a cancellation or abrogation of the contract by mutual consent of the parties." The appellant insists that the conclusion was erroneous.

[1] It is clear from the evidence that the contract expressly called for delivery of the lumber at the point of shipment, which was New Willard. The property then, as a matter of law, passed to appellee upon the delivery to the carrier at New Willard on September 20, 1920, and it is admitted by the parties that delivery to the carrier and the issuance of the bill of lading was a complete performance of the contract by appellant, the seller. In this view the appellant was not legally warranted, in virtue of the contract, in stopping the delivery. Hence the rights and remedies of appellant concerning the car of lumber, after delivery to the carrier at New Willard, were such only as an unpaid seller of goods would have. The lumber was sold on credit, with express stipulations as to time of payment. The bill of lading was an "open one," with no reservation of right to stop delivery in transit. In such case, where the property in the lumber has passed to the buyer and the seller has parted with the possession, as here shown, the unpaid seller has the equitable right to stop the lumber in transitu only in case of the insolvency of the buyer. 5 Elliott on Contracts, § 5065; 24 R. C. L. p. 133. Insolvency of the buyer is of prime importance and a necessary condition to the right or its exercise. Carder v. Ry. Co., 170 Mo. App. 698, 153 S. W. 517; Music Co. v. Bridge, 134 Wis. 510, 114 N. W. 1108. As appears, the appellee "was entirely solvent," and not insolvent, at the time and after the stoppage orders were given by appellant. The stoppage orders then were not under, but independent of, the contract, or any legal or equitable right of stoppage in transitu. Consequently, the act of appellant in directing the railroad companies to withhold delivery of the lumber would be characterized, legally speaking, as a purely voluntary act of countermand of the delivery and resumption of the car of lumber. The stop order had the effect to not only place appellant in control of the lumber, but in possession of it, through the railway agent acting in pursuance of appellant's express orders. The order to the delivering carrier

was: "Do not deliver car to consignees, but hold for our account."

That the appellee was refused delivery of the car of lumber upon arrival at place of destination is an admitted fact in the record. The appellee made prompt demand for the delivery, and was shown the stop orders. Appellee thereupon at once "told the said railway agent that the withholding orders of the plaintiff were accepted by the Denman Lumber Company, and for the railway agent to so advise the plaintiff." At the same time, and while the withholding orders were in effect, the appellee wired the appellant: "We are returning bill of lading and invoice Mo. P. to-day and replacing order." The bill of lading and invoice were promptly returned to appellant in a letter advising that the withholding of the lumber was "all right, except the reflection on our credit." The contract called for "quick shipment" of the lumber. In such facts the contract was, as determined by the court, rescinded by mutual consent, neither party thereafter having any enforceable rights therein.

[2, 3] The consent of the parties to the rescission of a subsisting simple contract may be implied from acts conduct with reference to their dealings with the property, and need not be shown by an express agreement. 35 Cyc. p. 129; 2 Black on Rescission and Cancellation, § 526. Thus, for instance, as applicable here, where the seller without legal justification and on his own volition takes back into his possession and control the property sold and delivered, and holds it subject to his order or as his property, or takes steps which are inconsistent with a completed sale and delivery of the property continuing in force, his assent to a rescission of the sale can be presumed. Such act of the seller of repossession of the property is, in effect, and is regarded as, a declaration of intention to countermand the delivery and reclaim the property, in such case there is open to the buyer the legal right either to sue as for conversion, or the alternative of assenting to the repossession of the property and the abandonment of the contract on the part of the seller and treating the contract as dissolved. In the event the buyer, as here, expressly consents or acquiesces in the seller resuming possession of the property sold and delivered, thereupon a rescission or abrogation is effected, not necessarily for legally sufficient cause, but by the mutual consent of the parties.

[4] In respect to the application of this rule it is immaterial what the specified reasons of the seller may have been in resuming possession and control of the property, when the reasons are not warranted by terms of contract or law. In the act of resuming possession, and in the expressed consent of the seller thereto, a rescission or abrogation is legally effected. No legal reason is apparent to preclude the appellee, which has not paid

for the lumber, from consenting, as it did, for appellant to have the lumber on such demand therefor, evidenced by the stop order. The appellee was not in fault or in default in respect to the stop order or refusal of the delivery so as to estop it from assenting to appellant's voluntary demand. The appellee acted promptly in the assent, and it is competent for parties to abrogate a simple contract by a naked agreement to that effect. The fact that appellant, after the notice of assent was given by appellee, offered back the possession of the lumber, would not prevent rescission or reinstate the contract in the absence of appellee's consent.

We have carefully considered the brief of appellant, which is well and clearly presented, and conclude that, in view of the evidence, the propositions therein should be overruled.

The judgment is affirmed.