**TEXAS GAS UTILITIES COMPANY,
Petitioner,**

v.

**S. A. BARRETT et al., Respondents.**

No. B–2107.

Supreme Court of Texas.

Nov. 25, 1970.

Rehearing Denied Dec. 31, 1970.

W. T. Blackburn, Corpus Christi, for petitioner.

Witherspoon, Aikin, Thomas & Langley, Thomas W. Kendrick, Hereford, Burrel B. Evans, Tulia, for respondents.

STEAKLEY, Justice.

This is a suit for minimum payments under a contract for natural gas service. It was instituted by petitioner, Texas Gas Utilities Company, sometimes called the gas company, against respondents S. A. Barrett, John Barrett and James Beavers. After trial to a jury, the trial court ruled in response to respondents' motion for judgment that they were entitled to judgment on the jury verdict and as a matter of law. A take nothing judgment was accordingly rendered against petitioner. The court of civil appeals affirmed upon the holding that the contract is unenforceable for lack of mutuality of obligation. 452 S.W.2d 508. Our views are otherwise which, in turn, calls for consideration of points not discussed by the intermediate court.

The contract upon which suit was brought was dated April 21, 1964 and was for a term of five years with an option to renew for an additional five years. The signatories were Associated Oil and Gas Company, petitioner's predecessor-assignor (the assignment being dated January 1, 1965) and respondents. The purpose of the contract was the supplying of natural gas for use by respondents in fueling irrigation water well pumps on farm properties which they held under a five year agricultural lease dated January 17, 1964.

The contract required an annual minimum payment during the life of the contract of $7.50 per 1400 h. p. for each engine installed.[1] A five mile pipe line to the properties was constructed by petitioner's predecessor in March, 1964, at an expense in excess of $100,000 and deliveries of natural gas were commenced on April 6, 1964. Subsequent to the execution of the contract, and prior to its assignment to petitioner on January 1, 1965, respondents were evicted from the leased properties by their lessors. The contract is silent concerning the obligations of the parties in such event. It does not appear to be disputed that natural gas was available at all times; that the gas company furnished gas as ordered by respondents; and that the gas company delivered gas to the successors of respondents, billed them therefor, and will credit respondents with the sums paid by such successors.

The basic obligation assumed by Associated Oil and Gas Company, and by petitioner as assignee of the contract in question, was the delivery of natural gas to respondents as set forth in Article I:

"Subject to the terms and conditions herein stated Company will from April 21, 1964 to April 21st, 1969 until the expiration or other termination of this agreement (unless prevented by one or more of the causes mentioned in Article VI hereof) deliver to Customer at a meter installed by Company on the service line owned by Customer downstream of Billing Meter, set at various water well locations on a 4100.33 Acre Farm, * * * natural gas for use by Customer for the following purposes only: Fuel for irrigation purposes for approximately twenty (20) water wells."

The obligation to furnish gas was subject, however, to these provisions in Article VI of the contract:

"Company will make reasonable provision to insure a continuous supply of natural gas but does not guarantee a continuous supply of natural gas, and shall not be liable for damages occasioned by interruptions to service or failure to commence delivery, caused by conditions beyond its reasonable control, by an Act of God or the public enemy, inevitable accident, floods, fire, explosions, strikes, riots, war, delay in receiving shipments of required material, order of court or judge granted in any bonafide adverse legal proceedings or actions, or any order of any commission or tribunal having jurisdiction in the premises or without limitation by the preceding enumeration any other act or thing reasonably beyond its control or interruptions necessary for repairs or changes in Company's distributing system. No payment, however, shall be required from Customer for service which Company herein agrees but fails to furnish.

"*It is further and distinctly understood and agreed that the Company assumes no obligation whatever regarding the quantity or quality of gas delivered hereunder, or the continuity of service, and shall not be liable therefor,* but Company will endeavor to supply the requirements of Customer for the above class of service to the extent of the amount of gas available for such service and to the extent permitted under

---

1. Article II provided that 'Customer shall be billed monthly and will on or before the tenth day from date of billing pay company for gas delivered or made available hereunder between the last two meter readings (called 'Billing Period') at the following rates and amounts.
1. 55 cents per each 1,000 cubic feet of gas.
2. An annual minimum payable in equal monthly installments, whether used or not,

of $7.50 per horsepower for each engine installed, the original engines installed hereunder having 1400 horsepower. In event the original engines be abandoned or replaced by ones of lesser horsepower, the original engine horsepower rate shall apply; if replaced by one of greater horsepower the new shall apply."

any agreement between Company and any producer of gas available to Company for the supply of natural gas to Company, and subject to such limitations in the sale of gas for this class of service as in Company's opinion may be necessary for the continued maintenance of the supply of gas for domestic use, it being recognized that Company is dependent for gas to be supplied hereunder upon gas produced by [sic] Company by other producers." (Italics are added.)

It was the view of the court of civil appeals that under Article VI, particularly the italicized portion, the gas company was not obligated to furnish gas and for this reason the contract was unenforceable as lacking in mutuality of obligation. This, in respondents' words, is their "first and foremost" position in asserting nonliability for the minimum payments which petitioner seeks to recover.

As has been noted by recognized legal scholars, a commonly repeated statement by the courts is that mutuality of obligation is a requisite in the formation of a contract, and that both parties to a contract must be bound or neither is bound. See 1 Williston on Contracts § 105A, at 420 (1957); 1A Corbin on Contracts § 152, at 2 (1963); 1 Page on Contracts § 565, at 949 (1920). The Williston treatise suggests that however limited, this is but a way of stating that there must be valid consideration. Professor Corbin urges the view that mutuality of obligations should be used solely to express the idea that each party is under a legal duty to the other; each has made a promise and each is an obligor. This is said to be the meaning with which the term is commonly used and that it is more correct to say that it is consideration that is necessary, not mutuality of obligation. But it has also been concluded "that logic is as powerless to disprove the existence of the mutuality rule as it has been shown to be powerless to establish its existence * * * that no logic is able to connect the supposed mutuality rule with any formulation of the doctrine of consideration

and no other logical justification for it has ever been suggested." Oliphant, Mutuality of Obligation in Bilateral Contracts at Law, 25 Colum.L.Rev. 705 (1925); 28 Colum.L.Rev. 997 (1928).

Be all of this as it may, this Court in Texas Farm Bureau Cotton Ass'n v. Stovall, 113 Tex. 273, 253 S.W. 1101 (1923) spoke quite succinctly of the rule of mutuality of obligation when it said:

"Reduced to its last analysis, the rule is simply that a contract must be based upon a valid consideration, and that a contract in which there is no consideration moving from one party, or no obligation upon him, lacks mutuality, is unilateral, and unenforceable. * * * It is quite elementary that the promise of one party is a valid consideration for the promise of the other party."

In speaking of mutual reciprocal obligations as consideration, the rule was stated in Clement v. Producers' Refining Co., 277 S.W. 634 (Tex.Comm.App.1925) that "where no other consideration is shown, mutual obligations by the parties to the agreement will furnish a sufficient consideration to constitute a binding contract." See also Johnson v. Breckenridge-Stephens Title Co., 257 S.W. 223, (Tex.Comm.App. 1924) and Roberts v. Anthony, 185 S.W. 423, (Tex.Civ.App.—Amarillo 1916, no writ.) It is presumed that when parties make an agreement they intend it to be effectual, not nugatory. Portland Gasoline Co. v. Superior Marketing Co., Inc., 150 Tex. 533, 243 S.W.2d 823 (1951). A contract will be construed in favor of mutuality, Carpenter Paper Co. v. Calcasieu Paper Co., Inc., 164 F.2d 653 (5th Cir. 1947). The modern decisional tendency is against lending the aid of courts to defeat contracts on technical grounds of want of mutuality. Armstrong v. Southern Production Co., Inc., 182 F.2d 238 (5th Cir. 1950).

It is clear to us that the agreement here in question is a binding and enforceable contract. The writing embodies an ex-

change of obligations of value to each contracting party, reciprocally or mutually induced. The gas company was bound to deliver natural gas to the various water well delivery points specified in the contract; to make reasonable provisions to insure a continuous supply of natural gas; to endeavor to supply the requirements of respondents; and to install the necessary metering equipment at its own expense. Respondents were in turn bound to pay for the gas delivered to their wells upon their order and to pay the minimum charges provided in the contract. These mutually imposed obligations are not negated by the language used. See Portland Gasoline Co. v. Superior Marketing Co., Inc., supra. The gas company explicitly bound itself in Article I to deliver natural gas to respondents "unless prevented by one or more of the causes mentioned in Article VI hereof." The exculpatory clause in Article VI did not relieve the gas company of this obligation. It would have been subject to liability for breach of contract if it had failed upon order to furnish gas to respondents for causes other than those specified in Article VI. The extent of the exculpatory clause is that the gas company assumed no obligation—made no guarantee—either that gas would always be available or that gas of a particular quality would always be available. It was bound, however, to supply *available* natural gas to respondents within the restrictions of Article 6057, R.C.S. of Texas, 1925.[2] Cf. Standard Oil Company of Texas v. Lopeno Gas Company, 240 F.2d 504 (5th Cir. 1957).

We accordingly hold that the contract upon which petitioner sued is enforceable against respondents. This will require a reversal of the judgment of the court of civil appeals unless it is otherwise supportable under counterpoints urged by respondents in their brief there. McKelvy v. Barber, 381 S.W.2d 59 (1964).

In addition to the counterpoint urging lack of mutuality of obligation, respondents presented to the court of civil appeals their claims that the contract was rescinded by the acts of the parties prior to the maturing of the minimum charge obligations; that because of a pleading failure petitioner was bound by the prayer in its original petition for the recovery of minimum payments in the sum of $8,335.05, more than which amount had been paid to it by respondents, and hence could not recover the higher sum of $34,737.36 alleged to be due, and prayed for, in its first amended original petition; and that petitioner failed to prove an assignment of the contract from Associated Oil and Gas Company and hence had no interest in the contract upon which it declared.

The jury answered affirmatively to a cluster of issues (Nos. 1A, 1B, 1C, 1D, 1E), submitted over the objections of petitioner as without legal import, which inquired (A) if respondents wrote a letter to petitioner's predecessor informing the latter of their eviction from the land and that it would have to "look to someone else for payment";[3] (B) if the letter was received;

---

2. "No such pipe line public utility shall discriminate in favor of or against any person, place or corporation, either in apportioning the supply of natural gas or in its charges therefor; nor shall any such utility directly or indirectly charge, demand, collect or receive from any one a greater or less compensation for any service rendered than from another for a like and contemporaneous service; provided this shall not limit the right of the Commission to prescribe different rates and regulations for the use of natural gas for manufacturing and similar purposes, or to prescribe rates and regulations for service from or to other or different places, as it may determine."

3. Respondent S. A. Barrett, reconstructed the letter as follows:

"Kress, Tex.
Nov. 1964

Texas Gas Utilities
Del Rio, Tex.
Dear Sir:
In regard to the bill on the reverse side of this letter, please be advised that it should be sent to Mr. Gail [sic] O. Thomp-

(C) if petitioner's predecessor "remained silent regarding its acceptance or rejection of the proposition stated therein";[4] (D) if the silence caused respondents to believe that petitioner's predecessor would no longer look to them for payment; and (E) if as a result of their belief, respondents either acted or refrained from acting to their detriment. The jury also answered affirmatively to an issue which inquired if petitioner "by its conduct agreed to a rescission * * * of the contract" (Issue No. 2). Petitioner objected to submission of this issue "for the reasons that there is no evidence to support" its submission and for the further reason, among others, "that there is insufficient evidence to raise such issue."

Respondents urged before the court of civil appeals, as they do here, that the issues were proper; that "there was some evidence and there was sufficient evidence to support the findings" which, in turn, afforded a proper basis for the take nothing judgment of the trial court. The evidence they cite as supportive of the jury finding that petitioner by its conduct agreed to a rescission is (1) "the circumstance that the terms of the contract seem to contemplate a rescission if defendants [respondents] lost possession of the land because it placed upon them duties which could be performed only if defendants [respondents] were in possession", cited examples of which were the obligation of respondents to protect the property of the gas company on the farm properties and to keep an accurate record of the operating times that gas was used; (2) the writing of the letter by respondent Barrett to Associated Gas and Oil Company, before-mentioned; (3) the identifying reference to the contract in question as "B & B Farm, Thompson and Payne" in the assignment from Associated Gas and Oil Company to petitioner; (4) the billing of Gayle Thompson for gas supplied to the farm subsequent to the repudiation letter; and (5) the fact that petitioner subsequently entered into contracts with later occupiers of the farm containing similar minimum payment provisions.

█ It is correct, of course, that parties may rescind their contract by mutual agreement and thereby discharge themselves from their respective duties. The mutual release of the rights of the parties is regarded as a sufficient consideration for the agreement. As stated by Professor Corbin, expressions of assent are usually in the form of an offer by one and an acceptance by the other and an operating agreement of rescission can be made tacitly as well as expressly. 5A Corbin on Contracts § 1236 at 542 (1964). See J. R. Gray Co., Inc. v. Ritchey Flying Service, Inc., 358 S.W.2d 396 (Tex.Civ.App.—Waco 1962, writ ref'd n. r. e.); Whaley Lumber Co. v. Reliance Brick Co., 2 S.W.2d 911 (Tex.Civ.App.—Amarillo 1928, no writ); Lynch Davidson & Co. v. Denman Lumber Co., 270 S.W. 225 (Tex.Civ.App.—Texarkana 1925, writ dism'd); Steinlein v. S. Blaisdell, Jr. Co., 44 S.W. 200 (Tex. Civ.App.1898, no writ). It is also observed by Professor Corbin that a mere expression of repudiation by one party to a contract is not an offer of rescission. But even if this is so under particular facts, there must yet be an acceptance by the other party either affirmatively or by acquiescence in a manner and under circumstances sufficient to constitute an elec-

son of Floydada St. in Plainview Tex., as he was the user of the gas covered by this statement. We, James Beaver, John Barrett and myself have been forcibly evicted from this farm by Mr. Thompson and will be no longer associated with it. Hence you must look to him for any future payment of all gas bills for all gas used on this farm and for all compliance on our contract with you after the date of our eviction.
Sincerely
S. A. Barrett"

4. Petitioner does not dispute receipt of the letter or that its predecessor "remained silent."

tion to treat the contract as terminated. This is not supportably shown in the fact that a party is silent after being notified of a repudiation by the other contracting party and thereafter acts in self protection by taking steps to mitigate damages.

■ For these reasons the circumstances urged by respondents do not constitute evidence of a mutual agreement to rescind the agreement in question. The letter from respondent, S. A. Barrett, to petitioner's predecessor was not in a form of an offer but was an unequivocal and imperative declaration in the name of "We, James Beaver, John Barrett and myself" that "you must look to him [Gayle O. Thompson, one of the lessors of the farm properties] for any future payment of all gas bills for all gas used on this farm and for all compliance on our contract with you after the date of our eviction." There was no duty to acknowledge or disavow the repudiation and the failure to do so under the attendant circumstances may not be converted into a binding assent or a consummating acceptance of an offer of rescission, or otherwise constitute any species of estoppel.

■■ As mentioned earlier, there is no provision in the contract defining the rights of the parties in event of loss of the farm property either by a voluntary act of respondents or by eviction. If we apprehend the arguments of respondents, they are saying that in such an event, however, the contract is automatically rescinded or gives rise to a right of respondents to unilaterally repudiate the contract. This is said to arise by implication because of contractual duties imposed upon respondents which could be performed only if they remained in possession of the land. These provisions do not carry the claimed prospective effect but are simply grounded on the assumption that the contract will continue for its term, during which time respondents were bound to do the things

agreed upon. These initial agreements of the parties can have no probative force upon the question of whether an agreement to mutually rescind the contract subsequently came about. Moreover, the act of petitioner in billing the owner-lessor Thompson for gas subsequently delivered to the farm, and the success of petitioner in replacing the repudiated contract with later ones of similar import, all payments under which have been credited to respondents for the period in question, is not conduct indicative of assent to a rescission. It was the duty of petitioner to mitigate its losses and its doing so was favorable to respondents. See Walker v. Salt Flat Water Co., 128 Tex. 140, 96 S.W.2d 231 (1936). Nor may any particular significance be given the incidental fact that the identification of the contract in question included a reference to the owners-lessors in the assignment from Associated Gas and Oil Company to petitioner.

The pleading problem is this. Petitioner alleged in its original petition that because of breaches of their contract respondents became bound and obligated to pay petitioner $8,335.05, for which it prayed judgment. This amount was increased to $34,737.36 in the allegations and prayer of petitioner's First Amended Original Petition filed some nine months later. Petitioner thereafter filed five instruments denominated supplemental petitions, respectively, Plaintiff's First, First Amended, Second Amended, Third Amended, and Plaintiff's Fourth Amended Supplemental Petition. Each was recited to be in response to a particular pleading of respondents and each, with the exception of the first, concluded with a prayer "as in its original petition." Trial was concluded on April 2, 1969. On April 17, petitioner moved for leave to file a Fifth Amended Supplemental Petition "for the reason that the prayer set forth in Plaintiff's Fourth Original Amended Supplemental Petition contains an erroneous adoption by reference of the prayer in Plaintiff's Original

Petition whereas such reference should have been, and was intended to be, to Plaintiff's First Amended Original Petition." The trial court denied this motion on May 14 and rendered its take nothing judgment on May 29, 1969. It is the position of respondents that they were not on notice that they were being sued for $34,737.36 instead of $8,335.05; that petitioner led them into believing that the suit was for the lesser amount and is estopped to claim otherwise. And, additionally, that the trial court did not abuse its discretion in overruling petitioner's motion for leave to correct the alleged errors in the supplemental petitions.

■ The reference in the prayers concluding the supplemental petitions was unnecessary and meaningless. The original petition had been superseded by petitioner's First Amended Original Petition and statements in the former were not subject to adoption by reference in the supplemental petitions. See Rule 58.[5] The function of a supplemental petition is response to a pleading of the other party. Rules 69 and 80. But there is still the question of whether respondents were misled. It is clear from the form and contents of the five pleadings in question that they served the function of supplemental petitions and did not purport to be substitutes for petitioner's First Amended Original Petition. There was no objection to evidence at the trial as not within the issues made by the pleadings, nor was the reference in the prayers in the supplemental petitions to that of the original petition, rather than that of the First Amended Original Petition, called to the attention of the court during the trial as constituting a defective or faulty pleading. See Rule 66.

The evidence offered by petitioner was directed to the establishment of the liability of respondents for the minimum payments provided in the contract for a period of four years and four months, the total of which greatly exceeded the damages of $8,335.05 as prayed for in the original petition and was stated to be in the sum of $34,737.36 in the prayer of the First Amended Original Petition. Respondents do not point to any occurrence during the trial of the case in support of their argument that they were misled into believing that petitioner's suit was for the lesser amount prayed for in the original petition and the conclusion seems inescapable that they had notice of the nature of the suit and the damages sought thereby. The controlling pleading in this respect was petitioner's First Amended Original Petition and at the least there was a trial by implied consent of the case there pleaded. See Rule 67. The Fifth Amended Supplemental Petition tendered by petitioner after trial of the case for the purpose of correcting the erroneous references in the prayers of the previous supplemental petitions was unnecessary, and the action of the trial court in denying its filing is of no importance.

■ The final counterpoint of respondents before the intermediate court, and here, although not shown to have been suggested to the trial court in any manner, is that the evidence conclusively shows that petitioner had no interest in the contract originally between them and Associated Oil and Gas Company upon which it sued. This is predicated upon the identification of the contract in the assignment from Associated to petitioner as "Customer's Name: B & B Farms (Thompson and Payne)", and upon the testimony of a representative of petitioner in a different context that "My recollection is that the Thompson and Payne contract was entered into prior to the S. A. Barrett, John W. Barrett and James Beavers contract." So, say respondents, this shows conclusively that petitioner held a contract with Thompson and Payne and not with respondents.

---

5. All references to Rules are to the Texas Rules of Civil Procedure.

The point is without merit. As pointed out by petitioner in reply, their suit against respondents was as assignee of, and expressly predicated upon, the contract between Associated and respondents, the assignment of which to petitioner was not denied. See Rule 93. It is also shown that bills for gas sent to respondents by Associated and paid by them carried the identification "B & B Farms". Additionally, the contract of assignment contained a general "catch-all" provision which included " * * * all * * * gas purchase and sales contracts and any other contracts, privileges and franchises used in connection with the business acquired."

Finally, it is noted that respondents urge a counterpoint not presented to the intermediate court to the effect that the take nothing judgment was proper because the burden was upon petitioner to obtain fact findings supporting any award of damages. Their argument is that petitioner should not be allowed to recover the full amount of the contractual minimums when petitioner admits that it contracted with others to mitigate its damages. This corresponds to the trial pleadings of respondents that they are entitled to credits for gas payments to petitioner by their successors. The right of respondents to these credits is acknowledged by petitioner who itself put in evidence without dispute the amounts of its receipts from the sale of gas to the subsequent occupiers of the farm properties during the term of the contract, as well as the sums respondents themselves paid for gas before their eviction. There is however, a discrepancy between petitioner's computation of damages in its brief and prayer as appellant before the court of civil appeals and in its application for writ of error and prayer for rendition of judgment. The judgments below will therefore be reversed and the cause remanded to the trial court for entry of judgment consistent with this opinion.

It is so ordered.