FUN MOTORS OF LONGVIEW, INC. and Louis Randall Latch, Appellants,

v.

GRATTY, INC., Appellee.

No. 06–00–00075–CV.

Court of Appeals of Texas, Texarkana.

Submitted May 17, 2001.

Decided June 21, 2001.

Mark D. Strachan, Longview, for appellant.

Glenn D. Phillips, Hearne & Phillips, Kilgore, for appellee.

Before CORNELIUS, C.J., GRANT and ROSS, JJ.

## OPINION

Opinion by Justice GRANT.

Fun Motors of Longview, Inc. and Louis Randall Latch, Fun Motors's president, appeal from a judgment against Latch in favor of Gratty, Inc. for tortious interference with contract in the amount of $175,901.87 ($42,901.87 in compensatory damages and $133,000 in lost profits).

On appeal, Latch and Fun Motors attack a number of the trial court's findings of fact and conclusions of law with respect to the various elements of tortious interference with contract.

## BACKGROUND

Louis Randall Latch is the president of and owner of the stock in Fun Motors of Longview, Inc. On November 6, 1996, Latch, as president of Fun Motors of Longview, Inc., concluded an Asset Purchase Agreement (Agreement No. 1) with Jim Gratton, as president of Gratty, Inc., governing the sale of Fun Motors's ongoing Kawasaki sales and service business. According to the terms of Agreement No. 1, Gratty agreed to purchase and Fun Motors agreed to sell the franchise for $90,000 on the condition precedent that Gratty obtain Kawasaki's approval to operate a dealership.

Fun Motors and Gratty executed a second Asset Purchase Agreement on March 4, 1997 (Agreement No. 2), the terms of which were identical to the original agreement except for an additional term providing for owner financing of part of the purchase price. At that time, Gratty's president signed a Promissory Note to Fun Motors for $40,000, the owner-financed portion of the purchase price. By its terms, Agreement No. 2 superseded Agreement No. 1.

Gratton testified that he signed Gratty's completed Kawasaki Dealer Application on March 7 and duly submitted it for Kawasaki's approval. In a brief to this court, Gratty asserts the application was submitted on March 7. But the evidence unequivocally shows Gratty's application was not submitted until April 25, when it was submitted directly to Kawasaki's attorney.

On April 1, 1997, before submission of Gratty's Kawasaki Dealer Application, Latch entered into a Buy/Sell Agreement with Scott Zhorne in which he agreed to sell and Zhorne agreed to purchase the same Kawasaki franchise for $90,000 on the condition precedent that Zhorne obtain Kawasaki's approval to operate a dealership. The agreement does not mention Fun Motors by name, but was signed and made in Latch's name. Zhorne submitted his completed Kawasaki Dealership Application to Kawasaki for approval on April 28, 1997, three days after the submission of Gratty's.

The evidence shows that Kawasaki's attorney sent three letters to Latch repeatedly requesting that he indicate which application Kawasaki should process and which contract was enforceable. Having received no satisfactory response from

Latch, Kawasaki refused to consider either application and instead filed a lawsuit in federal court against Fun Motors, Gratty, and Zhorne. In its suit, Kawasaki sought a declaratory judgment as to who, between Gratty and Zhorne, had the superior or actual contractual right to the assets conveyed under the various contracts.

Before resolution of the federal lawsuit, however, Kawasaki terminated Fun Motors's Kawasaki Authorized Dealer Sales and Service Agreement in administrative proceedings before the Texas Department of Transportation. Proceedings to terminate Fun Motors's Kawasaki franchise had been instituted in January 1997, two months after Agreement No. 1 was concluded, due to low market share figures. Kawasaki's federal lawsuit was dismissed in early 1998 because, the franchise having been revoked, Fun Motors no longer possessed the subject matter of the contracts and thus could not convey the franchise.

Gratty brought suit against Fun Motors and Latch alleging that Fun Motors committed breach of contract and violated the Texas Deceptive Trade Practices Act and that Latch engaged in tortious interference with Gratty's contractual relations with Fun Motors. Following a bench trial, Gratty was awarded judgment on its tort claim against Latch, but the court ordered Gratty take nothing on its claims against Fun Motors.

## DISCUSSION

■ The elements for a cause of action for tortious interference with contract are (1) existence of a contract subject to interference, (2) occurrence of a willful or intentional act of interference, (3) that was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred. *Holloway v. Skinner*, 898 S.W.2d 793, 795–96 (Tex.1995). Fun Motors and Latch attack a number of the trial court's Findings

of Fact and Conclusions of Law with respect to the various elements of tortious interference with contract.

■ The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a jury question. *In re Davis*, 30 S.W.3d 609, 613 (Tex.App.—Texarkana 2000, no pet.). We review conclusions of law *de novo* as legal questions and uphold them if the judgment can be sustained on any legal theory supported by the evidence. *Johnston v. McKinney Am., Inc.*, 9 S.W.3d 271, 277 (Tex.App.—Houston [14th Dist.] 1999, pet. denied).

■ In conducting a legal sufficiency review, we consider only the evidence and inferences in support of the finding, and disregard all evidence and inferences to the contrary. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992). We uphold the fact finder's determination if any probative evidence supports it. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex.1997). In conducting a factual sufficiency review, we view all of the evidence and sustain the factual sufficiency challenge only if we conclude that the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996) (per curiam).

■ In *Holloway*, the Texas Supreme Court held that tortious interference with a contract may only be committed by one who is a stranger to the contract in question. *Holloway*, 898 S.W.2d at 796. Relying on *Holloway*, Fun Motors and Latch contend the evidence is legally and factually insufficient to support the trial court's finding of an act of interference by Latch

in Finding of Fact No. 19. They contend Latch signed the Buy/Sell Agreement in his capacity as corporate agent of Fun Motors. According to their contention, this corporate act cannot constitute third-party interference with Agreement No. 2 because Fun Motors is a party to Agreement No. 2. Gratty, however, contends Latch concluded the Buy/Sell Agreement in his individual capacity, in which case the act *can* constitute tortious interference with Agreement No. 2, because Latch is not a party to Agreement No. 2. The trial judge's findings of fact indicate that Latch was liable individually for concluding the Buy/Sell Agreement.

■ Gratty contends that if Latch wished to defend against the tortious interference with contract claim on grounds that he was not liable in the capacity in which he was sued, he had the duty to raise that affirmative defense in a verified pleading in accordance with TEX.R. CIV. P. 93. *See* TEX.R. CIV. P. 93; *Butler v. Joseph's Wine Shop, Inc.*, 633 S.W.2d 926, 929 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.). He did not do so. Absent a verified pleading raising the defense, only trial by consent will prevent waiver of the issue. *RE/MAX of Texas, Inc. v. Katar Corp.*, 961 S.W.2d 324, 328 (Tex.App.—Houston [1st Dist.] 1997), *pet. denied*, 989 S.W.2d 363 (Tex.1999).

■ Texas Rule of Civil Procedure 67 provides for trial by consent. *See* TEX.R. CIV. P. 67. Trial by consent is intended to cover the exceptional case where it clearly appears from the record as a whole that the parties tried the unpleaded issue. *Stephanz v. Laird*, 846 S.W.2d 895, 901 (Tex.App.—Houston [1st Dist.] 1993, writ denied). To determine whether the issue was tried by consent, we must examine the record not for evidence of the issue, but rather for evidence of trial of the issue. *Id.* The record shows that

Gratty introduced the Buy/Sell Agreement and testified that Latch signed it in his individual capacity. Latch testified that he was acting on behalf of Fun Motors. This conflicting testimony amounts to trial by consent of the issue; the defense is not waived.

■ We thus address this point and determine whether legally and factually sufficient evidence supports the trial court's Finding of Fact No. 19, in which it held Latch personally liable for his conduct in entering the Buy/Sell Agreement. The evidence shows that the Buy/Sell Agreement by its terms is expressly concluded between Latch and Zhorne, with no reference at all to Fun Motors. Moreover, Agreements No. 1 and No. 2, which are signed "Louis Randall Latch, President of Fun Motors of Longview, Inc.," are evidence that Latch knew how to effect a corporate act, should he have so desired. This evidence is legally sufficient to uphold the trial court's finding that Latch acted in his individual capacity when he signed the Buy/Sell Agreement with Zhorne.

With regard to evidence contrary to the court's finding, it is undisputed that the Buy/Sell Agreement purports to convey a right to purchase substantially all of the assets of Fun Motors and that Latch had no legal right to convey those assets in his individual capacity. But the fact that Latch individually had no legal right to convey the assets purported to be conveyed in the Buy/Sell Agreement is irrelevant to a determination of whether he concluded the agreement at all. The evidence shows that Kawasaki considered with Zhorne the contract's significance and Latch sought to bypass the corporate entity.

■ And, although Latch testified he acted in his corporate capacity at all pertinent times, the fact finder is the proper

judge of a witness's credibility. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). The trial judge was free to disbelieve Latch's testimony. Having reviewed all of the evidence bearing on the issue, we cannot find the evidence is so overwhelmingly against the trial judge's finding as to result in factual insufficiency. And there has been no pleading or proof of alter ego. We are thus bound to uphold the trial judge's finding of fact that Latch, rather than Fun Motors, was party to the Buy/Sell Agreement. The contention that Latch's act could not constitute third-party interference for the purpose of proving tortious interference with contract must fail; the first point of error is overruled.

Latch and Fun Motors also contend the trial court failed to find an existing contract subject to interference, as required to prove tortious interference with contract. They further contend the evidence would not support any such finding because the so-called contract did not contain mutually dependent promises and therefore was not binding.

■■■■ A contract will be construed in favor of mutuality. *Texas Gas Util. Co. v. Barrett,* 460 S.W.2d 409 (Tex.1970). In the present case, the contract being an express obligation by Fun Motors to sell the property in question was an obligation of mutuality by Gratty. It could be considered implied that the "buyer" listed in the contract as Gratty was obligated to purchase by the contract to complete the mutuality. The contract recites that, "In consideration of the premises and of the respective representations, warranties, covenants, agreements, and conditions of the buyer and Seller contained herein, it is hereby agreed . . . ."

■■ Latch and Fun Motors contend that Gratty had no obligation to seek Kawasaki's approval under the terms of the agreement, and therefore because Gratty had no duty to ensure fulfillment of the condition precedent, the contract was void for lack of mutuality. However, conditions precedent do not render a contract void. When the act to be done by a party can be done only if a corresponding act is done by another party, the obligation will be implied. *Ferguson v. Getzendaner,* 98 Tex. 310, 83 S.W. 374 (1904). The condition precedent is set forth in the contract in the following language, "Buyer's successful acquisition of Kawasaki franchise agreement together with all local, state and federal (if any) permits required to engage in the sales and/or service of Kawasaki products." Although this language does not specifically state that the buyer has an obligation to seek acquisition of the Kawasaki franchise agreement, this obligation could be inferred from the fact that this would be a requirement for the buyer to fulfill the contract and purchase the dealership.

■■■■ Furthermore, the test for mutuality must be applied at the time enforcement is sought, not at the time when the promises were made. *Cherokee Communications, Inc. v. Skinny's, Inc.,* 893 S.W.2d 313 (Tex.App.—Eastland 1994, writ denied). A party may enforce the contract if such party has incurred expenses in part performance of the contract that were contemplated by the parties at the time of the contract's making, so long as such part performance confers at least a remote benefit to the other party. *Hutchings v. Slemons,* 141 Tex. 448, 174 S.W.2d 487, 489 (1943). In Finding of Fact No. 8, which is not challenged by Fun Motors and Latch on appeal, the trial court found that Gratty incurred expenses in part performance of the contract. Gratty's part performance conferred to Fun Motors the benefit of Gratty's compliance with Kawasaki's franchise requirements, so as to expedite the sale to Gratty of Fun Motors—

which was operating under a veritable Sword of Damacles as it awaited a ruling on the revocation of its franchise agreement.

As to the complaint that there was no finding of the existence of a contract in the Findings of Fact and Conclusions of Law, we find that no objection or proposed finding was made at the trial level. This objection was not preserved, and this point of error is overruled.

Fun Motors and Latch next contend the trial court erred when in Finding of Fact No. 22, it found Gratty was prevented from being approved as a Kawasaki dealer by Latch's conduct. They contend there is no evidence that Kawasaki would have approved Gratty to be a Kawasaki dealer. In essence, they attack the legal sufficiency of the evidence to support the causation element of tortious interference with contract.

 Proximate cause comprises cause in fact and foreseeability. *See, e.g., Clark v. Waggoner*, 452 S.W.2d 437, 439 (Tex.1970). Cause in fact requires the defendant's conduct to be a substantial factor in bringing about the plaintiff's injury, an injury that would not otherwise have occurred. *Peeler v. Hughes & Luce*, 909 S.W.2d 494 (Tex.1995); *Purina Mills, Inc. v. Odell*, 948 S.W.2d 927, 935–36 (Tex. App.—Texarkana 1997, pet. denied). To prove causation, Gratty was required to bring forth sufficient facts so that the evidence and its logical inferences support the reasonable probability that Latch's conduct was a substantial factor in preventing Kawasaki from approving Gratty to be a dealer. *See Purina Mills, Inc.*, 948 S.W.2d at 935–36. We must test the

legal sufficiency of the evidence to support the trial judge's finding in this regard.

 Gratty adduced evidence at trial that he leased premises that were preapproved by Kawasaki, that he obtained a loan for the amount of the working capital commitment required by Kawasaki, that he submitted a completed Kawasaki Dealer Application to Kawasaki for evaluation, and that he had successfully and profitably operated two other franchises in a neighboring town for the preceding nine or ten years dealing in all terrain vehicles (ATV), watercraft, and motorcycle sales. The evidence also showed that Latch's conduct in signing the Buy/Sell Agreement was the reason Kawasaki refused to evaluate Gratty's completed application. This evidence was legally sufficient for the trial court to conclude there was a reasonable probability that Gratty would have been approved by Kawasaki had Latch's conduct not prevented Kawasaki from evaluating Gratty's application.[1]

 Latch and Fun Motors next contest the trial judge's award to Gratty of $42,901.87 for actual expense damages, contained in both Finding of Fact No. 23 and Conclusion of Law No. 1. We conduct a *de novo* review and uphold the damage finding if it can be sustained on any legal theory supported by the evidence. *Johnston*, 9 S.W.3d at 277. The damage award comprises legal fees to prepare Agreement No. 2, legal fees to organize the business and building, and business expenses for the Longview location beginning in June 1996. These expenses were foreseeable because they were incurred to obtain Kawasaki's approval, and such approval was

---

1. Our disposition of the above points of error effectively disposes of appellants' point of error three, under which heading they contend the evidence is insufficient to support the trial court's Conclusion of Law No. 1, in which the judge concluded Gratty is entitled to judgment from Latch. Their argument under point of error three addresses only those issues already addressed above.

required to consummate the sale of the franchise, which was the object of the agreement between Gratty and Fun Motors. The foreseeability requirement of proximate cause is satisfied.

With regard to the cause in fact element, Latch and Fun Motors contend the trial court's award was in error because the expenses were incurred before the signing of Agreement No. 2. This contention ignores Latch's judicial admission that his agreement with Gratty for the purchase of the franchise began verbally in 1994. According to Latch's own testimony, he expected Gratty to submit a dealer application to Kawasaki beginning in 1994. The evidence is undisputed that the parties memorialized their previously-existing oral agreement in Agreement No. 1 in 1996, which agreement was in turn superseded by Agreement No. 2 in 1997.

The evidence showed Kawasaki worked with Gratty to select the Longview location and ultimately preapproved the location. Latch and Fun Motors point to evidence that Gratty operated his Arctic Cat ATV and ATK motorcycle franchises out of the location while awaiting finalization of the Kawasaki purchase. But Gratton testified that he opened the Longview location solely because he anticipated purchasing the Fun Motors Kawasaki franchise. The evidence shows the Longview location closed when Gratty was prevented from purchasing the Kawasaki franchise. We conclude this evidence supports a finding that Gratty would not have incurred these expenses were it not for his agreement to purchase Fun Motors's Kawasaki franchise, which was subsequently frustrated by Latch's conduct. Thus, Gratty proved its actual expense damages were proximately caused by Latch's conduct. We overrule this point.

■ Latch and Fun Motors next contend the trial court erred when in Finding of Fact No. 23 and Conclusion of Law No. 1, it found lost profit damages of $133,000. Again, we review findings of fact for legal and factual sufficiency and conclusions of law are reviewed *de novo*. Citing a 1938 Texas Supreme Court case, Latch and Fun Motors contend the court erred because these future profits are speculative and arise from a new enterprise. *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097 (1938).

The Texas Supreme Court explained and interpreted its holding in *Southwest Battery* in the more recent case of *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279–80 (Tex. 1994). The court reiterated that proof of lost profits must be reasonably certain and that the determination of what constitutes "reasonably certain" is fact-intensive. *Id.* at 279. The court held that the fact that an enterprise is new will not automatically preclude recovery for future lost profits, but rather is one factor in the "reasonable certainty" test. *Id.* at 280. The "enterprise" referred to is not the business entity, Gratty, Inc., but rather the activity alleged to have been damaged, the sale of Kawasaki motorcycles. *See id.* The focus of the test is on (1) the experience of the persons involved in the enterprise, (2) the nature of the business activity, and (3) the relevant market. *Id.*

The court in *Southwest Battery* upheld future lost profit damages where the persons involved had an established business record in the activity, the activity was for the sale of an established product (car batteries), and the established business record demonstrated to a reasonable certainty the volume of the plaintiff's share in the market. *Southwest Battery Corp.*, 115 S.W.2d at 1098–99. In *Pace Corp. v. Jackson*, the court upheld lost profit damages under similar circumstances, where the activity was the sale of cigarettes. 155 Tex.

179, 284 S.W.2d 340, 348–49 (1955). The court noted that where the fact of success is not in doubt, but only the probable extent of such success, a plaintiff will not be prevented from recovering by an inability to prove a perfect measure of damages. *Id.* at 348; *see also Gulf Coast Inv. Corp. v. Rothman,* 506 S.W.2d 856, 858 (Tex. 1974) (citing *Hindman v. Texas Lime Co.,* 157 Tex. 592, 305 S.W.2d 947, 953 (1957)).

The evidence shows that Gratty was in the business of selling ATVs and had been successful at it for the previous nine or ten years. Like the plaintiffs in *Southwest Battery* and *Pace,* Gratty thus had the demonstrated experience and knowledge to succeed in the activity in question. And as in the sale of cigarettes and car batteries, the activity in question here is the sale of an established product, Kawasaki motorcycles. The record shows there is an identifiable, quantifiable market in the ATV industry that is constantly measured by industry actors; this is not a speculative or uncertain activity.

Unlike in *Southwest Battery* and *Pace,* Gratty's probable volume in the relevant market was not so easily shown for lack of suitable comparison models. Fun Motors and Latch contend Gratty's past performance as a dealer, Fun Motors's past performance in Longview, and the present Longview Kawasaki dealership's performance could have all been used as comparison bases. But Gratty's past performance in the activity was in a much smaller market in a different product line. The prior performance of Fun Motors was not suitable for comparison in light of a state agency determination that Fun Motors emphasized the sale of Hondas over the sale of Kawasakis, resulting in an intentionally depressed Kawasaki market share. And, finally, the Kawasaki dealership currently operating in Longview may not provide a suitable basis for comparison because it began as a single-line dealership that switched later to a multiple-line dealership, thus not conforming to the business plan Gratty had established to operate his prospective franchise. Moreover, Gratty was provided incomplete data from the current Kawasaki dealer, rendering a meaningful comparison impossible.

To prove the value of his projected lost profits, Gratty introduced the testimony and conclusions of Dr. Sammie P. Smith, a professor of accounting. Smith's qualifications to provide expert testimony were not called into question. Latch and Fun Motors contend Smith's projection of gross sales for 1999 and projected five percent annual growth in sales, the starting point and basis for his entire calculation, is nothing more than speculation. They correctly point out the evidence shows Smith's projected gross sales for 1999 overshoots the 1999 gross sales of the current Kawasaki dealership operating in Longview. But Smith testified that he could not make a meaningful comparison to or analysis of the incomplete information provided by that dealership.

The evidence shows Smith based his conclusions on information provided by Gratty and its accountant, various market and market share data for ATV, motorcycles, and watercraft, market forecasts made by Kawasaki's regional sales director, demographic and economic data for the Longview area, other relevant financial and economic data and tools, and various assumptions and computations deemed appropriate by him. Smith testified that he used techniques commonly and frequently employed in American industry. Smith concluded, as of the date of preparation of his report, Gratty suffered past lost profits in a range from $133,333 to $158,333. He further concluded that Gratty suffered future lost profits in a range from $363,802 to $432,014, for a total lost profit range of

$497,000 to $690,000. Fun Motors and Latch presented no evidence or expert testimony tending to refute Smith's calculations or provide an alternative calculation that would cast doubt on the accuracy of Smith's conclusions. The trial court awarded future lost profits in the amount of $133,000. Smith's testimony was legally sufficient to support the trial court's findings of fact with regard to damages. We find the evidence is also factually sufficient to support a finding that the damages award was proven with reasonable certainty. Having found the evidence supports the damages found in Finding of Fact No. 23, then the determination that Gratty is entitled to recover such damages made in Conclusion of Law No. 1 is also proper. This point is overruled.

Latch and Fun Motors finally contend the accounting expert and the trial court failed to offset the future lost profits with the $90,000 purchase price of the franchise. Agreement No. 2 allocates the total cost of the franchise over the various categories of assets purchased. By definition, a profit calculation involves determining the excess of revenues over expenditures in a business transaction. *See* BLACK'S LAW DICTIONARY 1226 (7th ed.1999). While Smith's calculations are not set out in detail, his calculation of profits on this basis was not questioned. During his testimony, Smith demonstrated his recognitions of these terminological distinctions in his discussion of profit, gross sales, and cost of goods sold. Because of the definition of profits, it would be presumed that he accounted for the cost of the various assets when calculating profit, as any calculation of profits would require, unless the record reflects the contrary.

The trial court's judgment is affirmed.