CUPPLES COILED PIPE, INC., and
Cupples Company, Manufacturers,
Appellants-Appellees,

v.

ESCO SUPPLY COMPANY,
Appellee-Appellant.

No. 6877.

Court of Civil Appeals of Texas,
El Paso.

Dec. 5, 1979.

Rehearing Denied Dec. 31, 1979.

Kendall, Randle, Finch & Osborn, Terrence Kendall, Austin, for appellants-appellees.

Philip E. Hamner, San Antonio, for appellee-appellant.

OPINION

OSBORN, Justice.

Based upon a jury verdict, Esco Supply Company (Esco) recovered judgment

against Cupples Coiled Pipe, Inc. (CCP) and Cupples Company, Manufacturers (CCM) for damages resulting from the manufacture and sale of defective pipe. Recovery was denied to Esco for attorney fees and litigation expense incurred in litigating claims of third parties. All parties have perfected an appeal from that part of the judgment which was adverse to them. We affirm.

This case involves three basic issues. The first is with regard to what caused the pipe to fail. The second is whether CCM is liable for damages resulting from the manufacture and sale of pipe by CCP. The third is whether Esco may recover litigation expense it incurred in defending the third party claims made against it by those who purchased pipe. In answer to special issues, the jury found (1) the pipe manufactured by CCP was defective; (2) the defective condition was a producing cause of the failure of the pipe; (3) the manner in which the pipe was utilized did not exceed the operating temperature and pressure for the pipe; (4) unanswered; (5) the percentage of failure from defective pipe was 100% and from utilization was 0%; (6) CCP was in effect the servant of CCM; and (7) the cost to repair or replace the defective pipe was $52,098.10.

## DEFECTIVE PIPE

In 1967, CCP began production of poly vinyl chloride pipe (PVC) which was used primarily for cold water plumbing systems. Several years later, CCP began production of chlorinated poly vinyl chloride pipe (CPVC) which could be used in hot water plumbing systems. In 1974, CCP filled an order from Esco and shipped to it approximately $10,000.00 worth of various sizes of CPVC Schedule 40 and Schedule 80 pipe. Esco, a wholesale plumbing supply company, sold part of such pipe to various plumbing contractors in San Antonio including C. R. Blank Plumbing Company and Gibson Plumbing Company. These contractors installed the pipe in the plumbing system in several apartment complexes in San Antonio. For a period of about two years there-

after, Esco received numerous complaints about breaks and leaks in this pipe, and much of it had to be replaced. Esco eventually paid C. R. Blank Plumbing Company $26,000.00 and Gibson Plumbing Company $26,098.10 to settle their claims against Esco for the cost of replacing pipe manufactured by CCP which was claimed to have been defective.

By two points of error, it is asserted that the jury's answers to special issues 3 and 5 are against the great weight and preponderance of the evidence and such answers are manifestly wrong. First, we must note that there is substantial evidence that the pipe was defective and the Appellants CCP and CCM do not attack the jury answer to special issue 1 which found that the pipe was defective.

Earl Doyle, a plastics consultant, testified concerning the operating pressure for Schedule 40 CPVC pipe at various temperatures and noted a safety factor of over 300%. At a temperature of 150° the maximum operating pressure would be 131.6 psi, at 160° it would be 112 psi and at 170° it would be 89.6 psi. There was evidence that the thermostats at the apartment complexes had been set at from 145 to 160 or 170°. Tests at the various complexes indicated a water pressure from around 65 to 70 psi. Calculations by the City Director of Engineering indicated slightly higher pressures in some instances, but no actual tests were conducted by him. One professional engineer indicated that there should be no failure in this pipe at 70 psi and at temperatures less than 180°. Applying the test in *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951), and considering all the evidence on the issue, we conclude that the jury findings in answer to special issues 3 and 5 are not against the great weight of the evidence. Points of error VI and VII are overruled.

## PARENT COMPANY LIABILITY

Cupples Company, Manufacturers (CCM) was organized in 1882. In 1965, it owned a substantial amount of stock in American Polystyrene Corporation (APC) and Preci-

sion and Scientific Industries, Inc. (PSI). In January, 1965, CCM caused Cupples Container Company (CCC) to be formed and about the same time an agreement was entered into whereby CCC would acquire the assets of Universal Container Corporation. In 1966, CCC acquired the remaining stock in APC and PSI. The following year, CCC acquired all of the outstanding stock of MagiCup Corporation. By the end of 1967, CCM had advanced funds to CCC totaling more than two million dollars.

CCP was incorporated as a Texas corporation in 1968. Its initial capitalization was $100,000.00 and CCC owned 85% of the stock. From 1966 through 1969, APC lost $1,929,650.00. From 1966 through 1970, PSI lost $376,754.00. During the period from 1967 through 1970, MagiCup Corporation lost $259,922.00. From 1968 to 1976, CCP lost $2,585,959.00. By the end of 1974, CCC had cumulative losses of $7,798,514.00. At that time it was liquidated and its assets transferred to CCM, including the shares which it was holding of CCP. By the end of 1974, CCM had paid for stock and contributed to the capital of CCC the sum of $2,783,525.00 and in addition had loaned or advanced to that corporation the sum of $7,526,848.00. Almost one-third of those sums ended up in CCP. The total sum advanced to CCP was $1,305,897.00 and in addition another $1,600,000.00 in advances was converted to common stock and additional paid-in capital.

At the time the pipe was sold by CCP in 1974, Marion Stuhl was president of CCM and CCP. Allan Barton, financial vice president of CCM, was also secretary-treasurer of CCP. At the time of its organization in 1968, three of the six board members of CCP were also CCM representatives and by 1974 all of the directors were representatives of CCM. When CCP went out of business at the end of 1975, its remaining assets were sold for $329,228.00 evidenced by a promissory note which was assigned by CCP to CCM as a credit on the debt owed to it by CCP. Thus, this suit ended up being against only a corporate shell and the parent company which had received the only valuable asset of the defunct pipe manufacturer.

An accountant who examined the financial statements of the various corporations testified that their relationship was more than just a stockholder relationship. He described it as a home office-branch warehouse operation whereby one spoon-fed the other to keep it alive. He said CCC and CCP were not adequately capitalized. He concluded the financial operations and the advancing of funds were not consistent with independent corporate entities. He also testified that the advance of money as accounts rather than loans adequately secured did not reflect a true stockholder relationship.

The Court in *State v. Swift & Co.,* 187 S.W.2d 127 (Tex.Civ.App.—Austin 1945, writ ref'd), said:

> The general rule seems to be that courts will not because of stock ownership or interlocking directorship disregard the separate legal identities of corporations, unless such relationship is used to defeat public convenience, justify wrongs, such as violation of the anti-trust laws, protect fraud, or defend crime. *State v. Humble Oil & Refining Co.,* Tex.Civ.App., 263 S.W. 319 (writ ref.); *Berkey v. Third Avenue Ry. Co.,* 244 N.Y. 84, 155 N.E. 58, 50 A.L.R. 599; *Cannon Manufacturing Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; . . .

That decision was cited with approval in *Bell Oil & Gas Company v. Allied Chemical Corporation,* 431 S.W.2d 336 (Tex.1968), where the Court discussed the issue of holding a parent corporation liable for a contract with a subsidiary. In recognizing the problem involved, Justice Norvell wrote:

> Dean Hildebrand has observed that, 'What circumstances will be required in order to make one corporation a mere agent or tool in the hand of another so that the corporate entity will be disregarded, is difficult to determine.' 1 Hildebrand, Texas Corporations 43 (1942). It seems reasonably certain, however, that the corporate arrangement must be one which is likely to be employed in

achieving an inequitable result by bringing into operation a basically unfair device which in all probability will result in prejudice to those dealing with one or more of the units making up the corporate arrangement, or one which has actually resulted in the complaining party's having been placed in a position of disadvantage by the exercise of inequitable means, of which the corporate arrangement is a part.

In 1975, the Texas Supreme Court in *Gentry v. Credit Plan Corporation of Houston*, 528 S.W.2d 571 (1975), recognized again the general rule noted above, but sought to relax the rule in tort cases. In its opinion, the Court said:

> Unlike a suit for breach of contract, the plaintiff in a tort case does not have the burden of justifying a recovery against the parent when he willingly contracted with the subsidiary. The problem in such a case is essentially one of allocating the loss. It is not necessary to establish fraud, and the financial strength or weakness of the subsidiary is an important consideration. . . .

■ Our problem is we are involved in a tort case (strict liability for a defective product) but one which arose out of a contractual arrangement whereby the purchaser chose the seller and dealt with it alone and not the parent company. If the problem be one of allocating the loss, and the financial weakness of the subsidiary is an important consideration, then the answer is relatively simple. The subsidiary is for all practicable purposes broke, it is out of business, and the loss can only be allocated to the parent company. But, in this case, there is more. Obviously, CCP was undercapitalized for the operations it was going to conduct. It could not have continued doing business except for the continual influx of substantial amounts of cash from CCM. Even its payroll was dependent upon weekly deposits of money supplied by both CCM and CCC and most, if not all, of the sums were made available upon a telephone call making known a need, not a negotiated loan with security to protect the party advancing the money. And, when the end came, what assets remained were funneled back to the parent corporation. We conclude Esco was "placed in a position of disadvantage by the exercise of inequitable means, of which the corporate arrangement is a part." This arrangement was grossly unfair and could be labeled constructive fraud. *Tigrett v. Pointer*, 580 S.W.2d 375 (Tex.Civ.App.—Dallas 1978, writ ref'd n. r. e.). Also see 1 Fletcher, Cyclopedia of the Law of Private Corporations, sec. 43 at 212 (1974). Points of error I, II and V are overruled.

■ A more difficult problem is presented as to whether special issue 6 is sufficient to support a verdict for the Appellee. That issue inquires:

> Do you find from a preponderance of the evidence that at the time the CPVC pipe in question was sold Defendant Cupples Company Manufacturers so dominated and controlled the business of Defendant Cupples Coiled Pipe, Inc., that Defendant Cupples Coiled Pipe, Inc., was not a separate and distinct entity in the conduct of its own business but was in effect the servant of Defendant Cupples Company Manufacturers in selling the CPVC pipe in question?
>
> As used herein, 'Servant,' means one who acts not for himself but on behalf of or in the interest of one other than himself.
>
> Answer 'We do,' or 'We do not.'
>
> We, the Jury, answer ___We do___.

The objections to the form of the issue were primarily that it did not submit all of the necessary elements to establish that one corporation was the alter ego of the other. But, objections were also made that:

> F. Such issue does not establish criteria by which the jury is to determine whether or not a relationship of 'alter ego' or 'agency' is to be established, but, in effect, leaves it up to the jury to determine what those criteria are.
>
> G. Fails to establish a basis upon which the jury can measure the extent to which dominion and control could make one corporation the servant of another.

We are inclined to agree that the issue might be defective if liability is to be based solely upon an alter ego claim. But, it appears to us, the issue was framed so as to submit to the jury the issue of liability based upon an agency theory. See: Corporate Liability-Subsidiary, 38 A.L.R.3d 1102 sec. 4 at 1116 (1971). We conclude the issue is sufficient for that purpose and the objections made are too general and do not show reversible error. Points of error III and IV are overruled.

### LITIGATION EXPENSE

Esco has appealed from that part of the judgment which denied it recovery of third party litigation expense which was incurred in defending claims made by those to whom the defective pipe was furnished. The parties stipulated and the Court found that $22,167.95 was the amount of litigation expense necessarily and reasonably incurred by Esco as a result of third party claims arising out of the sale of the defective pipe. However, the trial Court denied Esco recovery for such litigation expense.

After Esco filed the original suit against the manufacturer of the pipe, the two plumbing contractors, Blank and Gibson, both intervened suing Esco and the manufacturer. Also, an owner of one of the apartment complexes also intervened suing Esco and others. All of these claims were eventually settled and it was agreed that the claim of Esco for recovery of its litigation expense would be heard by the Court without a jury. Of the total expense incurred, $21,292.00 was for attorney fees and $875.95 for other litigation expense.

Esco does not cite any Texas authorities to support its position. It relies upon several text book statements with regard to litigation expenses arising out of a breach of contract. See Restatement of the Law, Contracts sec. 334 (1932); 22 Am.Jur.2d Damages sec. 166 at 235 (1965); 5 Corbin on Contracts sec. 1037 at 225 and 228 (1964). It also relies upon the holding in *De La Hoya v. Slim's Gun Shop*, 80 Cal.App.3d Supp. 6, 146 Cal.Rptr. 68 (1978), and the cases cited in that opinion.

First, we must note that Esco's recovery in this case is based upon strict liability and is a tort theory of recovery. This is not a case for breach of contract. In *Wm. Cameron & Co. v. American Surety Co. of New York*, 55 S.W.2d 1032 (Tex.Com.App.1932), the Court considered the question of a right to attorney fees as a result of litigation by third parties. In denying recovery, the Court said:

It is settled law in this state that, unless provided for by statute or by contract between the parties, attorneys' fees incurred by a party to litigation are not recoverable against his adversary either in an action in tort or a suit upon a contract. 13 Tex.Jur. p. 196; 11 Tex.Jur. p. 302. Counsel fees incurred in prosecuting a suit for or defending against a wrong are not ordinarily recoverable as actual damages. *Closner v. Chapin* (Tex. Civ.App.) 168 S.W. 370.

This is in harmony with the general rule in most of the states. 15 C.J. p. 114; *Union Ind. Co. v. Vetter* (C.C.A.) 40 F.2d 606.

That rule has continued to be followed in this State. *Mundy v. Knutson Construction Company*, 156 Tex. 211, 294 S.W.2d 371 (1956); *New Amsterdam Casualty Company v. Texas Industries, Inc.*, 414 S.W.2d 914 (1967); *Mays v. Witt*, 387 S.W.2d 688 (Tex. Civ.App.—Amarillo 1965, no writ).

We recognize that there are cases which have made exceptions and have permitted such recovery. See *Modine Manufacturing Company v. North East Independent School District*, 503 S.W.2d 833 (Tex.Civ.App.— Beaumont 1973, writ ref'd n. r. e.); *Fisher Construction Company v. Riggs*, 320 S.W.2d 200 (Tex.Civ.App.—Houston 1959) rev'd on other grounds, 160 Tex. 23, 325 S.W.2d 126. But, this case does not come within those exceptions. Inequitable as it may be, the law does not provide for the recovery of litigation expense in this case. Esco's points of error 1 and 2 are overruled. The judgment of the trial Court is affirmed.