**Roy S. PETERSON, Appellant,**

v.

**DEAN WITTER REYNOLDS, INC., Appellee.**

**No. 05–90–00607–CV.**

Court of Appeals of Texas, Dallas.

Feb. 13, 1991.

Rehearing Denied March 21, 1991.

Gary B. Maddox, Houston, George H. Tarpley, Dallas, for appellant.

Will S. Montgomery, David Ford Hunt, Charles Rodney Acker, Jenkins & Gilcrist, Dallas, for appellee.

Before WHITHAM, LAGARDE and KINKEADE, JJ.

## OPINION

WHITHAM, Justice.

The appellee, Dean Witter Reynolds, Inc., brought this action to recover a deficit in a futures trading account of its customer, the appellant, Roy S. Peterson. The trial court: (1) directed a verdict for Dean Witter on its case-in-chief; (2) directed a verdict against Peterson on certain of his cross-claims and affirmative defenses; and (3) submitted Peterson's remaining cross-

claims to the jury. Of those submitted to the jury, the jury found in Peterson's favor only on a breach of fiduciary duty issue. The jury, however, found no proximate cause for damages. Consequently, the trial court entered judgment in favor of Dean Witter and against Peterson and Peterson appeals. For the reasons that follow, we affirm. Furthermore, Dean Witter maintains on cross-appeal that Peterson has taken this appeal for delay and without sufficient cause. We find no merit in this contention. Therefore, we decline to assess any damages as requested by Dean Witter under Texas Rule of Appellate Procedure 84.

### Background

Peterson had over twenty-five years experience as a speculator in the commodities markets. He aggressively traded live cattle futures, live hog futures, and pork belly futures on the Chicago Mercantile Exchange. He maintained brokerage accounts at eight different firms over the years. Peterson started in business by speculating in real estate, but then became a full-time, professional commodities speculator. It was not unusual for Peterson to trade in large quantities of futures contracts. In fact, Peterson was one of the largest commodity speculators in the country, having controlled over 70 million pounds of live cattle at one time.

Traders like Peterson can either be "long" or "short" in their market positions. To be long means the trader is obliged to take delivery of a certain quantity of a graded commodity during the delivery month. To be short means that the trader has the obligation to deliver the same quantity of the graded commodity during the delivery month. The "delivery month" is the month during which the futures contract expires. At that point, one of two things happens: (1) delivery of the commodity takes place; or, (2) the futures contract is closed out when the short trader buys it back or the long trader sells. Pork belly futures contracts, for example, have delivery months of February, March, May, July, and August. One pork belly futures contract represents the obligation to take delivery of 40,000 pounds of frozen pork bellies.

Like most speculators, Peterson traded on margin, allowing him to leverage his money by putting up a fraction of the cost of the contracts. Margin takes two forms in commodities futures trading. To begin trading, a speculator must deposit a good faith amount of money, called "initial margin." To continue trading, the customer's margin money must maintain a certain level relative to the current market value of his positions. This is called "maintenance margin." The minimum margin for pork bellies is established by the Chicago Mercantile Exchange, but may be increased by the brokerage firm. The brokerage firm may not waive the margin requirement. If the market turns against the customer, the brokerage firm makes a "margin call" on the customer, requiring the customer to deposit additional margin money within a specified time in order to retain his positions. If the value of the customer's market positions falls far enough, the customer's account may go into a deficit, which means that his margin money has been exhausted, and his account has a negative worth. A deficit is a large, or very bad, margin call. If the customer cannot make a deposit sufficient to cover his margin call by the deadline given by the brokerage firm, the brokerage firm has the right to sell or liquidate the customer's position in the market to prevent further losses.

Commodities futures trading is regulated by, *inter alia*, the Chicago Mercantile Exchange. All brokerage firms and customers must comply with the Chicago Mercantile Exchange's rules and regulations. Among those rules is Rule 827, which governs what may be used as margin. Rule 827 (at all times relevant to this lawsuit) stated the only way a customer may meet his margin requirements:

Clearing members may accept from their customers as margin, cash, U.S. Government obligations, securities listed on the New York or American Stock Exchange (at a value of 70% of market prices), gold warehouse receipts registered for delivery on a U.S. designated contract market

(at a value of 70% of the London Spot Gold P.M. Fix), or for IMM or IOM traded commodities, except Random Length Lumber, Letters of Credit of not less than the amount required for initial margin.

Rule 827 goes on to say that if the customer fails to put up the required margin, the brokerage firm may liquidate the customer's account on as little as one hour's notice. Even if the customer never puts up the margin money, the brokerage firm must satisfy the exchange's margin requirements, if necessary, out of the brokerage firm's own pocket. Violation of Rule 827 is a "major offense," which can subject the brokerage firm to an action by the Chicago Mercantile Exchange. The Chicago Mercantile Exchange also regulates the time during which margin money must be paid. The Chicago Mercantile Exchange requires each brokerage firm to deposit at the Chicago Mercantile Exchange the amount of money necessary to keep the customer's account fully margined. If a customer's account goes into a deficit, then the brokerage firm must use its own capital to satisfy the Chicago Mercantile Exchange's requirements, then look to the customer to pay back the money. Hence, a deficit is, therefore, not an academic matter because the brokerage firm has already paid out the money it seeks to recover from the customer.

Peterson took his business to Dean Witter in early 1985. Peterson regularly traded hundreds of pork belly futures contracts at a time, representing millions of pounds of frozen pork. While Peterson traded through Dean Witter, he had a direct phone line to his account broker, and he was charged discounted commissions and minimum margin requirements. Also, Dean Witter set up a special bank account at Peterson's bank, to ensure quick transfers of money. Peterson had a computer in his office, which allowed him to track every trade by every customer in the market within a few seconds of its occurrence.

When he opened his account at Dean Witter, Peterson signed a customer agreement governing his relationship with Dean Witter. The customer agreement provides:

All transactions under this agreement shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, whether the transactions are executed by you or your agents....

\* \* \* \* \* \*

You [Dean Witter] are hereby authorized, *in your discretion,* ... should you for any reason whatsoever deem it necessary for your protection, *to sell any or all of the* securities and *commodities* or other property which may be *in your possession* or which you may be carrying for the undersigned ... in order to close out the account or accounts of the undersigned in whole or in part.... *Such sale, purchase or cancellation may be made according to your judgment and may be made, at your discretion, on the exchange or other market where such business is then usually transacted, ... without notice to the undersigned* ... and the undersigned shall remain liable for any deficiency....

The undersigned will at all times maintain margins for said accounts, as required by you from time to time.

(emphasis added).

### The Chicago Mercantile Exchange's Emergency Order

In early 1987, Peterson was long over 150 February pork belly futures contracts. On February 6, 1987, the Chicago Mercantile Exchange unexpectedly issued an emergency order requiring all speculators to reduce their holdings to 50 February contracts by February 11, and to 25 February contracts by February 13. Dean Witter had nothing to do with the issuance of the emergency order, and could not waive its effect on Dean Witter's customers. Peterson, like other speculators, had to sell some of his contracts to comply with the regulatory requirement. Following the emergency order, the market price of pork belly contracts dropped. As a result, Peterson began to have margin calls in his account. His first margin call, for $200,000, came on February 11th. As of that same day, Pe-

terson also had a deficit of over $90,000 in his accounts, in addition to the margin call. Peterson funded the deficit on February 12, but did nothing to satisfy the margin call. By the end of the day, the market had further moved against Peterson, creating a deficit of over $250,000 and margin requirements of another $200,000. Dean Witter had to pay the Chicago Mercantile Exchange the amount of the deficit and the maintenance margin, and wait for Peterson to repay Dean Witter. Peterson's account had a continuous margin call and deficit from February 13th through February 18th, but Peterson never again sent in any money to cover his futures trading losses.

### The Assigned Deliveries

Further increasing his debt to Dean Witter, Peterson was assigned deliveries on some of his futures contracts during mid-February, 1987. Delivery of a futures contract occurs when the Chicago Mercantile Exchange assigns the contract of a short trader (or seller) to the contract of a long trader (or buyer), and requires the short to deliver the commodity to the long. Ownership of the commodity is evidenced by warehouse receipts. The warehouse receipts are delivered to the brokerage firm the same day that the customer is notified of the delivery. When delivery occurs, leverage is no longer possible, and the brokerage firm must pay the Chicago Mercantile Exchange the full market price for the warehouse receipts before 9:00 a.m. the next morning. The brokerage firm must then recoup the money used to pay for the warehouse receipts from its customer.

For regulatory purposes, each commodity account is divided into two parts. In Dean Witter's accounting system, the part in which trading in futures contracts occurs is called a "type–4" or trading account. The other part is called a "type-G" or delivery account, and is where Dean Witter accounts for deliveries of commodities. This division into two parts is an internal accounting device of Dean Witter; Dean Witter divides the account because the Chicago Mercantile Exchange regulates futures trading (in type–4 accounts), but does not regulate deliveries (in type-G accounts). If a customer takes no deliveries, the type-G account shows no activity. If pork belly warehouse receipts are delivered, an entry is made showing an asset in the customer's type-G account. If the customer owes the brokerage firm margin money at this point, the market value of his pork belly warehouse receipts *cannot* be used to satisfy the margin, because Rule 827 does not allow the use of pork belly warehouse receipts as margin payments.

The Chicago Mercantile Exchange assigned Peterson's account delivery of seven warehouse receipts on February 11. Peterson's account took delivery of eighteen more warehouse receipts on February 12 or 13, and three more warehouse receipts on February 17. Because he was out of money, Peterson arranged for a third party, Larry Larsen, to pay for the warehouse receipts. Larsen wired $176,000 to pay for the first seven warehouse receipts directly into Peterson's account at Dean Witter. The Dean Witter branch office receiving money cannot put money directly into the delivery account. Instead, the money is received into the trading account (type 4) and then manually journaled into the delivery account (type G) by Dean Witter's New York office. On February 17, Larsen then wired $441,000, to pay for eighteen warehouse receipts, to Peterson's bank account in Houston. Peterson then wired the money to Dean Witter. Larsen and Peterson followed the same procedure for the last three warehouse receipts.

### Peterson's Accounts and Dean Witter's Actions

Shown below is a recap of the deteriorating status of Peterson's accounts, from February 12–18:

| | Feb. 12 | Feb. 13 | Feb. 14 | Feb. 15 | Feb. 16 | Feb. 17 | Feb. 18 |
|---|---|---|---|---|---|---|---|
| Margin Requirement | $327,000 | $311,000 | $311,000 | $311,000 | $311,000 | $306,000 | $0 |
| Deficit | $259,616 | $283,962 | $283,962 | $283,962 | $283,962 | $260,360 | $393,081 |

The amount Peterson owed Dean Witter on each day was the sum of the margin requirement and the deficit.

Peterson was in constant contact with his Dean Witter broker, Dottie St. Clair, and her manager, Alan Schroeder, during this time. Peterson spoke to St. Clair several times every day about his account. Peterson knew he had a serious deficit that he would have to pay to Dean Witter. St. Clair kept him continuously apprised of his accounts' status, and Peterson, by using his office quote-machine and his own aptitude for figures, could compute his own margin requirements within a few thousand dollars based on the market price. Both St. Clair and Schroeder repeatedly told Peterson beginning February 12th that he would have to cure the deficit in his account or face the possibility of liquidation of his positions. Finally, after giving Peterson six days to put up the money he owed, on February 18 Dean Witter notified Peterson by telephone and by hand-delivered letter that it would begin liquidating his positions within one day if he did not put up $260,360 (the previous day's deficit). The letter also notified Peterson that, even if he cured the deficit within the hour, he would have to deposit enough money to satisfy his maintenance margin requirements by 10:00 a.m. the next day, or Dean Witter would liquidate his positions. Because Peterson makes much of the letter, we quote the letter in full:

> At the close of business of February 17, 1987, your two commodity accounts (369–40500 and 369–40502) have total requirements of $306,000. The deficit in these accounts is $260,360. Unless sufficient funds are brought in to satisfy the deficit of $260,360 within the hour, we may begin to liquidate your open positions. No money has been received from you since Thursday, February 12, 1987 to cover losses on your futures positions.
>
> Further, we may begin, unless all open margin calls are satisfied by 10:00 a.m. CST, on February 19, 1987, a complete liquidation of your futures positions at Dean Witter Reynolds, Inc.

Thus, the letter gave Peterson two deadlines to pay Dean Witter the money owed: first, Peterson had to make up the deficit within one hour, and, if he did so; second, Peterson then would be given until 10:00 a.m. the following day to make the required margin payments.

Rule 827 allowed Dean Witter to give Peterson one hour's notice because the commodities markets are extremely volatile. Had the market turned completely against Peterson, Dean Witter faced the prospect of losing $250,000 per day while it waited for Peterson to raise money. The letter was delivered to Peterson at 11:37 a.m., central time on February 18. As Peterson well knew, the pork belly market closed at 1:00 p.m. every day. Peterson knew that if he forced Dean Witter to wait the full hour to begin the liquidation, there would only be twenty minutes to sell his positions. Even so, Peterson did not complain of the deadline, nor did he tell Dean Witter to begin the sale earlier, to allow more time for the sale. On February 18, one hour following the deadline, Dean Witter conducted a complete liquidation of all 306 futures contracts owned by Peterson. After Peterson missed his first deadline by failing to fund his deficit, the second deadline became moot.

### The $412,000.00 Debit to Peterson's Account

Once the liquidation was complete, Peterson still had a deficit of over $392,000 in his account. Peterson did not send in any money to pay the deficit, nor did he demand that Dean Witter reinstate his market positions. Therefore, following the futures contract liquidation on February 18, Dean Witter sold to Oscar Mayer, on February 20, 1987, the 18 warehouse receipts previously sold by Peterson to Larsen. Dean Witter knew of the prior Larsen purchase of these receipts because its own

broker gave the instructions for the handling of the receipt of the funds from Larsen but nonetheless sold these receipts to Oscar Mayer. Thus after February 20, 1987, all of Peterson's futures contracts and all of his warehouse receipts had been liquidated by Dean Witter. After these events, Dean Witter's records showed approximately an $18,000 surplus in Peterson's account. The $18,000 credit in Peterson's account was continually reflected on monthly statements generated by Dean Witter and sent to Peterson for in excess of two years, from March 1987 through April 1989. In May 1989, Dean Witter debited Peterson's account for $412,000, thereby reflecting the deficit of $393,000. The reason for this debit is shown below. It is the $393,000 deficit that Dean Witter recovered from Peterson in the judgment here at issue.

### The Larsen Claim

Larsen originally brought this suit against Dean Witter and Peterson. Larsen claimed, *inter alia,* that Dean Witter converted his warehouse receipts by selling them to Oscar Mayer. Dean Witter argued that it had a superior right to the warehouse receipts as against Larsen, but if not, then it had a right to recover against Peterson. The trial court granted Larsen's motion for summary judgment on the conversion claim. Dean Witter then settled the controversy with Larsen. Shortly after this settlement, Dean Witter debited Peterson's account for $412,000. Peterson does not question the amount debited.

### The Trial Court's Judgment

In the present case, after both sides had rested, the trial court directed a verdict in favor of Dean Witter on its breach of contract claim and against Peterson's claims for fraud, breach of contract, tortious interference with contract, and slander. For its claim, Dean Witter was awarded $393,811 in damages, representing the deficit in Peterson's trading account. Further, the trial court awarded Dean Witter attorney's fees totalling $253,709.84 plus additional sums pending any appeal and certain pre-judgment interest. On Peterson's remaining claims, the jury found that Dean Witter had breached its fiduciary duty to Peterson and awarded Peterson punitive damages totalling $100,000. The trial court, however, did not render judgment on this amount because the jury found that the breach of fiduciary duty did not proximately cause any actual damages. We address Peterson's points of error as briefed by Peterson.

### The Directed Verdict

In his first point of error, Peterson contends that the trial court erred by directing a verdict in favor of Dean Witter on its case in chief because probative, conflicting evidence was introduced which, when viewed most favorably to Peterson, would not support the directed verdict. In his second point of error, Peterson contends that the trial court erred by directing a verdict in favor of Dean Witter that Peterson take nothing on his cross-claims for breach of contract and tortious interference with contract because probative, conflicting evidence was introduced which, when viewed most favorably to Peterson, would support a recovery by Peterson on these claims. Peterson argues these questions together. The rule as generally stated is that the plaintiff is entitled to a directed verdict when reasonable minds can draw only one conclusion from the evidence. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978). The task of an appellate court in such a case is to determine whether there is any evidence of probative force to raise fact issues on the material questions presented. *Collora,* 574 S.W.2d at 68. The court must consider all of the evidence in the light most favorable to the party against whom the verdict was instructed, discarding all contrary evidence and inferences. *Collora,* 574 S.W.2d at 68. When reasonable minds may differ as to the truth of controlling facts, the issue must go to the jury. *Collora,* 574 S.W.2d at 68. In his brief, Peterson first argues trial court error in disposing of his cross-claims for breach of contract and tortious interference by directed verdict. Thus, we reach Peterson's second point of error.

First, we address Peterson's claim for breach of contract.

*Peterson's Breach of Contract Claim*

Peterson sees three components of his breach of contract claim: first, the "delivery breach"; second, the "liquidation breach"; and third, the "letter breach."

 "*The delivery breach.*" This claim is grounded on Dean Witter's failure to initially deliver the warehouse receipts to Larsen. As damages, Peterson claims the amount of his attorneys' fees to defend the Larsen suit. In Texas, attorneys' fees expended in prior litigation with third parties are not recoverable as damages: attorneys' fees are only recoverable when provided for by contract or by agreement between the parties. *See Cupples Coiled Pipe, Inc. v. Esco Supply Co.*, 591 S.W.2d 615, 619 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.) (attorneys' fees from prior tort or contract suits aginst third parties are not recoverable as damages in subsequent suits); *see Buck v. Johnson*, 495 S.W.2d 291, 297 (Tex.Civ.App.—Waco 1973, writ ref'd n.r.e.) (the trial court's assessment of third party cross-defendants' attorneys' fees as damages was error). Counsel's fees incurred in prosecuting a suit for or defending against a wrong are not ordinarily recoverable as actual damages. *Cupples Coiled Pipe*, 591 S.W.2d at 619. Thus, inequitable as it may be, the law does not provide for the recovery of litigation expense in this case. *Cupples Coiled Pipe*, 591 S.W.2d at 619. Because Peterson's damage element of his "delivery breach" claim fails as a matter of law, it follows that the trial court did not err in directing a verdict insofar as the "delivery breach" component of Peterson's breach of contract claim is concerned. In so holding, we decline to follow *Baja Energy, Inc. v. Ball*, 669 S.W.2d 836, 839 (Tex.App.—Eastland 1984, no writ). *See* Note, *Baja: An Aberration or a Catalyst*, 37 BAYLOR L.REV. 829, 837–39 (1985).

 "*The liquidation breach.*" This claim is grounded on Dean Witter's assert-ed failure to follow the customs and usages in the market. Peterson points to the language of the customer agreement: "All transactions under this agreement shall be subject to the ... custom and usages of the exchange or market...." Although Peterson tells us in his brief that "[e]vidence was introduced to show that Dean Witter did not do so [follow custom and usages] with respect to the liquidation," Peterson fails to cite to the record where we may find this evidence. Instead, Peterson proceeds to cite to the record a description of the manner of liquidation.[1] We conclude, therefore, that in the present case the references to certain facts do not contain proper references to the record where the matters complained of may be found. *Kropp v. Prather*, 526 S.W.2d 283, 288 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r. e.). The burden is on appellant to show that the record supports his contentions and to point out the place in the record where the matters complained of are shown. *Kropp*, 526 S.W.2d at 288. In the present case, the statement of facts contains 1,178 pages and 287 exhibits. In the present case, as in *Kropp*, we do not feel that the rules require us to read through the entire record to determine whether appellant's allegations have any validity. *Kropp*, 526 S.W.2d at 288. We conclude, as did the court in *Kropp*, that appellant has failed to meet his burden. *Kropp*, 526 S.W.2d at 288. Hence, we decline to search the record for evidence of what is "custom and usages." Nevertheless, we note that the customer agreement specifically provides that:

> You [Dean Witter] are hereby authorized, *in your discretion*, ... should you for any reason whatsoever deem it necessary for your protection, *to sell any or all of the* securities and *commodities* or other property which may be *in your possession* or which you may be carrying for the undersigned ... in order to close out the account or accounts of the undersigned in whole or in part.... *Such sale, purchase or cancellation may be made according to your judgment and*

---

1. "Manner of liquidation" tells us nothing about "custom and usages."

*may be made, at your discretion, on the exchange or other market where such business is then usually transacted, ... without notice to the undersigned ... and the undersigned shall remain liable for any deficiency....*

(emphasis added).

We conclude that the above quoted language of the customer agreement controls over the general contractual reference to "custom and usages" relied upon by Peterson. It is well settled that a special, or more particular, clause must prevail over a general clause. *Western Oil Fields, Inc. v. Pennzoil United, Inc.,* 421 F.2d 387, 389 (5th Cir.1970). *See Leopard v. Stanolind Oil & Gas Co.,* 220 S.W.2d 259, 263 (Tex. Civ.App.—Dallas 1949, writ ref'd n.r.e.). Moreover, we conclude that nothing contained in Peterson's description of the manner of liquidation establishes a violation by Dean Witter of the above quoted "in your discretion" language of the customer agreement and Peterson does not contend that it does so. Thus, we cannot say that there is any evidence to raise a fact issue on the "liquidation breach" issue. It follows, therefore, that the trial court did not err in directing a verdict insofar as the "liquidation breach" component of Peterson's breach of contract claims is concerned.

■ *"The letter breach."* By "letter," Peterson refers to Dean Witter's letter of February 18, 1987. Peterson urges that this letter "creates a contractual relationship between the parties." To this end, Peterson reads the February 18 letter to impose upon Dean Witter a contractual duty to wait until 10:00 a.m. February 19 to conduct a complete liquidation. Hence, Peterson insists that Dean Witter breached this "agreement" by conducting a complete liquidation of his positions on February 18. We disagree that Dean Witter "breached" a "contract." We read the February 18 letter as no more than a notice to Peterson that the axe is about to fall unless he, Peterson, makes good on his own contractual obligations. Understandably Peterson cites no authority holding that a letter notifying a debtor of a default creates a contract. Mutuality of obligation is a requisite in the formation of a contract. *Texas Gas Utilities Co. v. Barrett,* 460 S.W.2d 409, 412 (Tex.1970). A contract in which there is no consideration moving from one party, or no obligation upon him, lacks mutuality, is unilateral, and unenforceable. *Texas Gas,* 460 S.W.2d at 412 (citing *Texas Farm Bureau Cotton Ass'n v. Stovall,* 113 Tex. 273, 253 S.W. 1101, 1105 (1923)). In the present case, there was no consideration, no mutual promise, and no acceptance of this "contract" by Peterson. Even if Peterson could fashion an argument that the notice letter constituted an "offer," it is undisputed that there was no acceptance. Every witness, *including Peterson,* testified that Peterson did not send in any money to pay the deficit in order to extend the time to pay the remainder of his margin call. We conclude that the trial court did not err in directing a verdict as to the "letter breach" component of Peterson's breach of contract claim. We reach this conclusion because there was no contract to breach.

### Tortious Interference

■ Peterson maintains that Dean Witter tortiously interfered with the contract between him and Larsen for the sale of eighteen warehouse receipts. The essential elements of a claim for tortious interference are that: (1) a contract existed that was subject to interference; (2) the act of interference was willful and intentional; and (3) such intentional act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss occurred. *Griffin v. Rowden,* 702 S.W.2d 692, 693 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). Peterson repeats his contentions made under his "delivery breach" argument complaining of Dean Witter's failure to initially deliver the warehouse receipts to Larsen. Again, Peterson claims as actual damages the amount of his attorneys' fees to defend the Larsen suit. For the same reasons expressed in our disposition of the damage issue under Peterson's "delivery breach" argument, we again conclude this "attorneys' fee" damage claim fails as a matter of law. Peterson, however, suggests one

additional actual damage suffered by him. Peterson tells us that his "reputation in the industry in general and with Larsen in particular was damaged." Peterson, however, fails to tell us the amount of those damages or where we can locate in the record the means whereby those "reputation" damages can be determined. Indeed, during argument on the motion for directed verdict, the patient trial court tried for six pages of the record to obtain from Peterson's counsel the answer to the trial court's question: "What do you think his damages are; how many dollars?" The trial court never obtained an answer. On appeal, Peterson does not give us the answer. We decline to search the record for the answer. *See Kropp*, 526 S.W.2d at 288. Therefore, we conclude that Peterson's "reputation" damage claim fails as a matter of law. For the above reasons, we conclude that Peterson failed to establish the fourth element of a claim for tortious interference, *i.e.*, actual damage. It follows that the trial court did not err in directing a verdict as to Peterson's claim for tortious interference.

To summarize to this point, Peterson contends in his second point of error that the trial court erred by directing a verdict that Peterson take nothing on his cross-claims for breach of contract and tortious interference with contract. Having found no merit in any of Peterson's breach of contract component arguments and no merit in Peterson's tortious interference with contract argument, we overrule Peterson's second point of error. We turn next to consider Peterson's complaint as to the directed verdict in favor of Dean Witter on its case in chief. Thus, we reach Peterson's first point of error.

### Dean Witter's Breach of Contract Claim

The dispute centers on the existence of a deficit. Peterson insists that there was no deficit.[1] Peterson's calculations eliminate the deficit by treating as an "asset" the market value of the delivered warehouse receipts in Peterson's type-G account while at the same time counting the money received from Larsen to pay for those warehouse receipts as an "asset" in his trading account. We conclude that Peterson's calculation does not eliminate the deficit. We reach this conclusion for two reasons. First, Rule 827 does not permit using the warehouse receipts in Peterson's calculation. Second, Peterson cannot double count his assets. We reason that Peterson cannot simultaneously credit his accounts with Larsen's money to pay for the warehouse receipts and the warehouse receipts themselves. As a matter of law, and certainly of logic, Peterson must choose one or the other. It is admitted that if only one "asset" is counted in the calculation of the deficit, then Peterson's account shows a deficit. In short, we conclude that Peterson's calculation ignores reality. Peterson directed Dean Witter to send the warehouse receipts to Larsen. Hence, Peterson cannot have it both ways. Peterson cannot be heard to ask that the warehouse receipts be sent to Larsen and then argue that they should be counted as assets with which to eliminate his deficit. It is undisputed that as soon as the warehouse receipts were delivered to Peterson's account, Dean Witter had to pay the Chicago Mercantile Exchange for them. Dean Witter was entitled to collect the money for those receipts from someone. Larsen paid for the warehouse receipts, and the trial court subsequently determined that Larsen was entitled to receive his money back. Once Dean Witter paid Larsen his money back, that money had to be subtracted from Peterson's account, leaving a deficit. Peterson does not challenge the amount subtracted; to wit, $412,000.00. We conclude that as a matter of law Dean Witter is entitled to recover that deficit from Peterson. It follows that the trial court did not err by directing a verdict in favor of Dean Witter on its case in chief. We overrule Peterson's first point of error.

### Peterson's Waiver Defense

In his third point of error, Peterson contends that the trial court erred by failing to submit to the jury Peterson's affirmative defense of waiver because probative evidence was introduced to support the elements to establish waiver. Waiver

is an affirmative defense. Tex.R.Civ.P. 94. An appellant must make an effort to obtain jury findings with respect to an affirmative defense; otherwise, the appellant waived the affirmative defense. *See Conrad v. Judson,* 465 S.W.2d 819, 827 (Tex.Civ.App. —Dallas 1971, writ ref'd n.r.e.), *cert. denied,* 405 U.S. 1041, 92 S.Ct. 1312, 31 L.Ed.2d 582. In the present case, Peterson filed with the district clerk on November 6, 1989, a document entitled "Roy S. Peterson's Requested Charge of the Court." The trial court's charge was not prepared until November 8, 1989. Peterson never tendered his requested questions and instructions to the trial court. Perhaps this explains why nowhere in Peterson's argument appears reference to "Roy S. Peterson's Requested Charge of the Court." Indeed, nowhere in his argument does Peterson tell us if he objected to the charge or sought to obtain a jury finding on waiver. In any event, issues proposed for inclusion within the charge must be tendered *after* the draft charge is given to the parties by the court: the filing of a set of proposed questions, definitions and instructions before the charge conference, without more, does not suffice to preserve error. *See Wilson v. King,* 311 S.W.2d 957, 959 (Tex. Civ.App.—Austin 1958, writ ref'd). We conclude that Peterson waived his affirmative defense of waiver and failed to preserve the assigned error. We overrule Peterson's third point of error.

### The Proximate Cause Question

■ In his fourth point of error, Peterson complains that the trial court erred in submitting a "proximate cause" issue on Peterson's claim of breach of a fiduciary duty in liquidating Peterson's account because proximate cause was established as a matter of law. In his fifth point of error, Peterson contends that the trial court erred by accepting the jury's answer to the proximate cause question (question six) because it was against the great weight of the evidence. Peterson argues these two points together. The jury found no proximate cause. As to the "great weight of the evidence" question, we note that Peterson's fifth point of error is not briefed.

Points of error not separately briefed are waived. *La Sara Grain v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 568 (Tex.1984) (on reh'g). A point of error that is not briefed fails to meet the minimum requirements of Rule 414(e), Texas Rules of Civil Procedure [now Tex.R.App.P. 74(f) ], and the appellate court considers such a point to be waived. *Schero v. Astra Bar, Inc.,* 596 S.W.2d 613, 614 (Tex.App.— Corpus Christi 1980, no writ). We conclude that in the present case, Peterson waived his fifth point of error. We overrule Peterson's fifth point of error.

■ Next we consider Peterson's fourth point of error. Where the defendant's actions are alleged to constitute a breach of fiduciary duty, the defendant is entitled to a take-nothing judgment because of the jury's finding negating the existence of the essential element of proximate cause. *See Shindler v. Harris,* 673 S.W.2d 600, 606 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Peterson agrees. Peterson, however, argues that proximate cause was established as a matter of law because the wrongful liquidation of Peterson's account was established as a matter of law. We disagree that wrongful liquidation of Peterson's account was established as a matter of law. Instead, as shown from our disposition of Peterson's "liquidation breach" claim, Dean Witter did not wrongfully liquidate Peterson's account as a matter of law. Hence, we conclude that proximate cause was not established as a matter of law. We overrule Peterson's fourth point of error.

### Whether the Jinkins Rule Bars Dean Witter's Recovery

■ In his sixth point of error, Peterson contends that the trial court erred in entering judgment for Dean Witter on its case in chief because the judgment allowed a settling defendant to recover indemnity or contribution from a non-settling defendant in violation of the rule of *Beech Aircraft Corp. v. Jinkins,* 739 S.W.2d 19, 21– 22 (Tex.1987). Peterson states the rule of *Beech Aircraft* to be that "[t]he *Jinkins* Rule voids as a matter of public policy any

right of contribution and indemnity between defendants if the settling defendant is jointly responsible for the damages.... *International Proteins v. Ralston–Purina Co.*, 744 S.W.2d 932 (Tex.1988)." For purposes of this opinion we accept Peterson's statement of the rule. Peterson grounds his asserted violation of the rule of *Beech Aircraft* on the premise that "Dean Witter's claim against Peterson arises from its settlement with Larry Larsen." We disagree with Peterson's premise. Hence, we conclude that the trial court did not violate the rule of *Beech Aircraft.* We reach this conclusion for two reasons. First, Dean Witter and Peterson were not joint tort-feasors in Larsen's suit for conversion. The focal point of this determination prior to settlement was the trial court's order of April 27, 1988, granting Larsen's motion for partial summary judgment against Dean Witter on Larsen's counts for conversion or money had and received. There the trial court held Dean Witter solely liable for conversion of Larsen's property. Indeed, Peterson does not claim to, or admit to, conversion of Larsen's warehouse receipts. At most, Peterson tells us in his reply brief that "both Dean Witter and Peterson were sued by Larsen thereby making them, *potentially,* joint tort-feasors." (emphasis added). We conclude that suggested "potentially" will not operate to invoke the rule in the present case as Peterson would have us do. Second, Dean Witter sued Peterson for debt incurred under a contract, the customer agreement. Dean Witter did not sue Peterson for contribution. In this connection, we decline Peterson's invitation to treat Dean Witter's actions as an "artifice" designed to deceive the judicial system. As put to us in Peterson's reply brief:

> The creation of an account deficit (and the corresponding claim to recover same under a breach of contract theory) is an artifice designed to mask the true nature of Dean Witter's claim, which is to recover all or part of the sums paid to Larsen on a settlement. The *Jinkins* Rule prohibits such a result. The form in which Dean Witter cast its claim should not be allowed to override the public policy

which prohibits the substance of the claim from being successfully asserted.

By our above disposition of the issue of Dean Witter's breach of contract claim, we rejected Peterson's challenge to the account deficit. We continue to do so. Again we conclude that the trial court did not err in entering judgment for Dean Witter on its case in chief. Moreover, we conclude that in doing so the trial court did not violate the rule of *Beech Aircraft.* We overrule Peterson's sixth point of error.

### *The Calculation of Pre–Judgment Interest and Award of Attorneys' Fees to Dean Witter*

■ In his seventh point of error, Peterson contends that the trial court erred in calculating pre-judgment interest from March 1987 because the deficit on which the interest was calculated was not in existence prior to May 1989. The trial court calculated and awarded pre-judgment interest totalling $65,963.34. The trial court calculated interest for the period from March 31, 1987, (30 days after the month of liquidation) through February 6, 1990, (the date of judgment). Peterson asserts that the time period used to calculate interest was in error. Peterson argues that, at best, interest should be calculated beginning thirty (30) days from May 1989 "when the deficit was created by Dean Witter." We disagree that Dean Witter "created" the deficit. Instead, Peterson himself "created" the deficit by failing to perform the customer agreement. Indeed, Peterson's contention under his seventh point of error repeats arguments we have above rejected. Complicated though the computation may be, as shown above, the trial court did not err by directing a verdict in favor of Dean Witter on its claim in chief in the amount of $393,811.00. That claim was for the amount of the deficit. As discussed above, that deficit existed in February 1987 and remained unpaid by Peterson at all times thereafter. Hence, we conclude that the trial court did not err in calculating pre-judgment interest for the period from March 31, 1987, to date of judgment. We overrule Peterson's seventh point of error.

In his eighth point of error, Peterson contends that the trial court erred in awarding attorneys' fees to Dean Witter if this court decides that Dean Witter was not entitled to recover on its case-in-chief because Dean Witter would not be a prevailing party. We have decided that Dean Witter was entitled to recover on its case in chief. We overrule Peterson's eighth point of error.

### Dean Witter's Attorneys' Fees on Appeal and Rule 84 Damages

In its sole cross-point of error, Dean Witter contends: (a) that this court should award Dean Witter its attorneys' fees on appeal and (b) a ten percent (10%) penalty against Peterson under Texas Rules of Appellate Procedure 84. The trial court awarded Dean Witter $45,000.00 if this case were appealed. We affirm the trial court's judgment. Consequently, we decline to award Dean Witter an additional $45,000.00 for a successful appeal to this court.

Next, we consider Dean Witter's request for an award of Rule 84 damages. The Rule provides:

> In civil cases where the court of appeals shall determine that an appellant has taken an appeal for delay and without sufficient cause, then the court may, as part of its judgment, award each prevailing appellee an amount not to exceed ten percent of the amount of damages awarded to such appellee as damages against such appellant.

TEX.R.APP.P. 84. Hence, we must determine if Peterson has taken this appeal for delay and without sufficient cause. First, we consider the question of taking the appeal without sufficient cause. We cannot say that Peterson has taken this appeal without sufficient cause. Indeed, we do not read Dean Witter's brief to argue want of sufficient cause other than to express the conclusion that Peterson's arguments are without merit. Next, we consider whether Peterson has taken this appeal for delay. Rule 84 derives from former Rule 438 of the Texas Rules of Civil Procedure. In addressing the "has been taken for de-

lay" question under the former rule, we looked at the case from the point of view of the advocate and determined whether he had reasonable grounds to believe that the case would be reversed. *See Beckham v. City Wide Air Conditioning Co.*, 695 S.W.2d 660, 663 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Assuming this to be the correct standard under Rule 84, we apply it to the present case. We cannot say that this appeal reflects dilatory tactics on the part of Peterson's attorney. *See Beckham*, 695 S.W.2d at 663. Consequently, we conclude that Peterson's counsel, as advocate, had some reasonable grounds to believe that the case would be reversed. *See Beckham*, 695 S.W.2d at 663. We conclude, therefore, that Peterson did not take this appeal for delay. The purpose of Rule 84 is to shift part of an appellee's expense and burden of defending himself in a frivolous appeal to the appellant. *Dallas County Appraisal Dist. v. The Leaves, Inc.*, 742 S.W.2d 424, 431 (Tex.App.—Dallas 1987, writ denied). Nevertheless, we conclude that in the present case we cannot assess damages under Rule 84 of ten percent of the trial court's monetary judgment against Peterson. Accordingly, we refuse to assess damages against Peterson and in favor of Dean Witter in the amount of ten percent (10%) of the damages awarded to Dean Witter. We overrule Dean Witter's cross-point.

Affirmed.